DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
 {¶ 1} Appellant, Jason Meyers, appeals from the decision of the Summit County Court of Common Pleas. This Court affirms.
 I. {¶ 2} In the late evening hours of August 8, 2002, the victim, Joanna Finnigan ("Finnigan"), was walking to a friend's house. During her walk, two men appeared from behind a bush and attacked her. One man raped her.
Eventually, she was able to run away, leaving behind her clothes and purse. As *Page 2 
she fled, Finnigan saw the two men going through her purse. When she arrived at her friend's home she called the police.
 {¶ 3} The police went to the scene of the rape and located Finnigan's clothes and purse. Finnigan described the man who raped her as a white male between the ages of 25-30, approximately five feet, eleven inches to six feet tall, weighing approximately 180 to 200 pounds and a muscular build with blondish brown hair. Finnigan was taken to the Developing Options for Violent Emergencies ("DOVE") unit. DOVE is a specialized healthcare facility designed to provide expert care to victims of violent sexual assault. The DOVE unit nurses took photographs, genitalia swabs, and fingernail scrapings of Finnigan. This was all part of the rape kit that was submitted to the Ohio Bureau of Criminal Identification ("BCI"). Finnigan was unable to identify her attackers from a police photo array.
 {¶ 4} The Akron Police Department sent the rape kit to BCI in November of 2004. BCI then forwarded the rape kit to another laboratory to perform DNA testing on the semen recovered from Finnigan. On July 20, 2006, BCI compared the male DNA to a database and found that the DNA from the rape kit matched Meyers' DNA. The Akron Police Department then obtained a search warrant for a buccal swab to obtain Meyers' DNA, and submitted it to BCI. On December 13, 2006, BCI submitted a report comparing Meyers' DNA with the sample from the rape kit and determined that Meyers could not be excluded as the source of the *Page 3 
DNA. The DNA was consistent with 1 in 13 sextillion, 790 quintillion people. Finnigan subsequently identified Meyers' half brother from a photo array as the man who held her down while Meyers attacked her.
 {¶ 5} On October 23, 2006, Meyers was indicted on one count of rape, in violation of R.C. 2907.02, one count of kidnapping, in violation of R.C. 2905.01, and one count of robbery, in violation of R.C. 2911.02. Meyers pled not guilty and the matter proceeded to a jury trial. On March 29, 2007, the jury found Meyers guilty of the rape and kidnapping charges, and not guilty of the robbery charge. The trial court sentenced Meyers to ten years of incarceration on the rape charge and eight years of incarceration on the kidnapping charge, to run consecutively. On April 25, 2007, the trial court denied Meyers' motion for a new trial. On July 25, 2007, Meyers was adjudicated a sexual predator. Meyers timely appealed from his convictions and sentencing, raising 11 assignments of error for our review. We have combined some of Meyers' assignments of error for ease of review.
 II. ASSIGNMENT OF ERROR I "[MEYERS'] CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 ASSIGNMENT OF ERROR II "THE COURT IMPROPERLY DENIED THE MOTION TO DISMISS AT THE END OF THE STATE'S AND [MEYERS'] CASE." *Page 4 
 {¶ 6} In his first and second assignments of error, Meyers argues that his conviction was against the manifest weight of the evidence and was based on insufficient evidence.
 {¶ 7} "While the test for sufficiency requires a determination of whether the state has met its burden of production at trial, a manifest weight challenge questions whether the state has met its burden of persuasion." State v. Gulley (Mar. 15, 2000), 9th Dist. No. 19600, at *4, citing State v. Thompkins (1997), 78 Ohio St.3d 380, 390 (overruled on other grounds). Further,
 "[b]ecause sufficiency is required to take a case to the jury, a finding that a conviction is supported by the weight of the evidence must necessarily include a finding of sufficiency. Thus, a determination that [a] conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." (Emphasis omitted.) State v. Roberts (Sept. 17, 1997), 9th Dist. No. 96CA006462, at *5.
 {¶ 8} Therefore, we will address Meyers' claim that his conviction was against the manifest weight of the evidence first, as it is dispositive of his claim of insufficiency.
 {¶ 9} When a defendant asserts that his conviction is against the manifest weight of the evidence,
 "an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Otten (1986), 33 Ohio App.3d 339, 340. *Page 5 
 {¶ 10} This discretionary power should be invoked only in extraordinary circumstances when the evidence presented weighs heavily in favor of the defendant. Id.
 {¶ 11} In the present case, Meyers was convicted of rape and kidnapping. However, as his first two assignments of error only address the rape conviction, we will limit our discussion to the rape conviction.
 {¶ 12} R.C. 2907.02(A)(2) states that "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force."
 {¶ 13} Meyers does not contest the fact that Finnigan was raped. However, he claims that this is a case of mistaken identity, and that the evidence does not support a finding that he was the individual who raped Finnigan. Meyers does not deny the fact that the DNA evidence proved that he and Finnigan had sex, however, he argues that there was no evidence "that the DNA deposit was placed there, through a [rape], as the evidence presented by the expert from Cellmark was that the semen could have [been] placed much earlier, and someone else raped her who did not ejaculate." Meyers appears to contest Finnigan's credibility. We find that the testimony presented at trial supported the jury's finding and Finnigan's testimony that Meyers was the man who raped her.
 {¶ 14} Finnigan testified that she was 21 years old in 2002. On the evening of August 8, 2002, Finnigan was walking to a friend's home. She admitted that *Page 6 
she had had several beers prior to leaving. As she was walking, a man jumped out in front of her, grabbed her, and threw her into the bushes. She noticed another man hiding in the bushes. The man who jumped out of the bushes was tall with a stocky build and blond hair that came to his shoulders. The man waiting in the bushes was short with a slim build and short, dark hair. The man with the blond hair was the initial aggressor. The man with the dark hair held her arms while the man with the blond hair tore off her clothes and raped her. When it appeared as if the men were attempting to trade places, she kicked one man in the genitals and ran away. Finnigan testified that she was naked as she ran to her friend's house and called the police. She described her attackers to the responding officers. Finnigan had injuries to her arm, elbow, shoulder, back, and marks on her throat from where she had been choked. Finnigan stated that prior to the rape, she had never seen the two men who attacked her. A female officer drove Finnigan to the hospital where a "rape kit" was performed. Medical personnel performed a pelvic exam, took photographs of the injuries and took Finnigan's medical history. She was then permitted to shower. The case went cold for four years.
 {¶ 15} During the rape, Finnigan "was petrified. I thought they were going to kill me." Immediately following the rape, Finnigan could not identify her attackers from a photo array that the police presented to her. It is unclear from the testimony whether Meyers' photo was included in the initial photo array. *Page 7 
 {¶ 16} In the fall of 2006, the police contacted Finnigan to inform her that, based on DNA evidence, they had found her attacker. However, Finnigan was still unable to identify her attackers in a photo array. Meyers' photo was included in the array. Finnigan identified Meyers in court as her attacker. "He looks a lot different than he did, but in the face he looks the same." On cross examination, Finnigan stated that she identified Meyers as her attacker because "he was the only one that penetrated me and he's the only one that they have DNA evidence of. *** Everyone that's involved in the case told me that the only person they have DNA evidence on is him." Meyers' counsel then asked, "So you're saying because they have the DNA evidence it must be him?" Finnigan agreed. She stated that she could never forget his face. Finnigan reiterated that she was able to identify Meyers due to the DNA match. She again testified that she had never seen Meyers before, and had "never seen him since until now."
 {¶ 17} The State next called Jenifer Markowitz ("Markowitz"), a forensic nursing consultant and a forensic nurse examiner with the DOVE program. The DOVE program is a specialty medical clinic for patients with violence complaints. Markowitz was the sexual assault nurse who examined Finnigan on August 8, 2002. According to Markowitz, Finnigan was fidgety, restless, and did not have good eye contact. She was disheveled, dirty, barefoot, and had some pine needles on her. Markowitz read the narrative that she obtained during Finnigan's treatment regarding the rape. The narrative was consistent with Finnigan's *Page 8 
testimony at trial. Markowitz stated that Finnigan had injuries on her cheeks, throat, back of the neck, lower back, shoulder, elbow, wrist, finger, knee, shin, buttocks, triceps, and feet. Markowitz collected the physical evidence in accordance with the protocol set forth in the Ohio Sexual Assault Evidence Collection Kit ("the rape kit"). This included taking swabs from inside Finnigan's mouth, scrapings from under her fingernails, combing and collection of pubic hair, genitalia swabs, blood samples, and collecting any debris from her clothing. The collected evidence then went into the box that the rape kit came in. The State presented the box at trial and Markowitz indicated that it was in substantially the same condition as it was when she collected it. On cross-examination, Markowitz testified that she was unsure if ejaculation occurred. She noted multiple abrasions on the inside of each side of Finnigan's labia majora. Finnigan informed her that she had not had consensual sex within the last 72 hours and that the date of her last consensual sexual activity was three months prior. Finally, Markowitz stated that "in my years of doing general women's health I actually have not seen this distribution of injury in a patient who reported consensual sex." On re-cross examination, Markowitz confirmed that it is possible that if Finnigan had had sexual activity prior to the attack, those fluids could have still been present.
 {¶ 18} Robert Davenport testified on behalf of the State. Davenport explained that he was Finnigan's employer in 2002 and that he and Finnigan "just kind of like had a crush on each other." He explained that Finnigan was coming to *Page 9 
see him the night of August 8, 2002. He dozed off and awoke to a bang on the door. When he opened it, Finnigan informed him that she had been raped. She was "in a panic," and had bruises, a black eye, and scratch marks all over her. She informed Davenport that she would never forget her attacker's face and that she did not know who he was. Davenport testified that he had never had sexual intercourse with Finnigan.
 {¶ 19} Stacy Violi testified on behalf of the State that she was a forensic scientist in the serology/DNA section of BCI. Violi compares DNA samples from crime scenes to known DNA samples. Her work is reviewed by two other people. BCI located semen on Finnigan's vaginal and rectal smear slides. As a regular practice, the fingernail scrapings were not tested. The fingernail scrapings were resubmitted and tested at a later date.
 {¶ 20} According to Violi, BCI looked for and found sperm cells in Finnigan's rape kit. Sperm cells are shaped like a sesame seed and have tails that fall off after approximately 12 hours. A rating scale is used to indicate the amount of sperm located, with a plus four being the highest rating. In the instant case, the sperm located in the vaginal smear was a plus four with tails and the sperm in the rectal smear slide was a plus two. Violi explained "[concerning the vaginal smear slide, if tails are present it indicates that the sexual intercourse has occurred sooner rather than later." After the semen was located, Orchid Cellmark, a private laboratory, analyzed the DNA from the rape kit. After the analysis, the results *Page 10 
were sent back to BCI to be reviewed. Violi stated that there were two DNA profiles, one of Finnigan, and one of an unknown male. Violi did a DNA test on a sample of Meyers' known DNA that was later submitted and compared it to results from Orchid Cellmark. The DNA from Finnigan's rape kit was consistent with Meyers' DNA. BCI used a statistical program to determine how often that particular profile would occur. "Based on the national database provided by the Federal Bureau of Investigation, the expected frequency of occurrence of the DNA profile identified in the sperm fraction of the vaginal swabs, the rectal swabs and the skin stain swabs labeled perineum is one in 13 sextillion 790 quintillion individuals." She reiterated that there were no other DNA profiles found in Finnigan's rape kit. Violi also tested the fingernail scrapings and determined that it contained a mixture of DNA profiles, consistent with Finnigan and Meyers.
 {¶ 21} The State also called Dr. Charlotte Word, a forensic DNA consultant for Orchid Cellmark. Dr. Word reviewed the DNA analysis in the instant case and agreed with the findings. There was "quite a large sperm number on these various samples which indicates that at the time of collection it was a fairly recent ejaculation] and that there was a very large number of sperm present." From the swabs, Dr. Word found a mixture of DNA consistent with a single unknown male and Finnigan. The State asked Dr. Word "[i]f someone else had sexual intercourse with [Finnigan] besides the sperm profile you're finding there, would you expect to see a mixture of DNA, a second male DNA?" Dr. Word explained that *Page 11 
"generally anyone that deposited sperm within a 24-hour window of when this sample was checked we would certainly expect to see that DNA profile. And if this were under the scenario that there were two males that deposited sperm, we would expect to see a mixture in the sperm fraction of those two males."
 {¶ 22} Several Akron police officers testified on behalf of the State. The officers' testimony indicated that Finnigan had been consistent in her description of her attackers and her description of the attack.
 {¶ 23} Loretta Xenias, Meyers' mother, testified on his behalf. She testified to photographs taken of Meyers on December 25, 2001 and June 29, 2002. The photographs, according to Xenias, accurately depicted Meyers in 2002. Meyers did not have blond hair in the 2002 photograph. Finally, she testified to a photograph taken on December 24, 2002. Again, she testified that the photograph accurately depicted Meyers in 2002. According to Xenias, Meyers has had short hair from 1999 to at least 2003.
 {¶ 24} We find from our review of the record that the jury did not clearly lose its way when it found Meyers guilty of rape. Finnigan testified that she had never seen the two men prior to the rape and Markowitz testified that Finnigan informed her that she had not had consensual sex within 72 hours prior to the rape. Further, Markowitz testified that Finnigan told her that she had last had sexual intercourse three months prior to the rape. We find that Finnigan's testimony was credible as it was consistent with what she told Markowitz and the police officers *Page 12 
at the scene. Further, Violi and Dr. Word testified that Meyers' DNA was discovered in Finnigan's rape kit. As such, we find that the jury could believe Finnigan's testimony and determine that Meyers' DNA evidence was found because he was the individual who raped her. Finally, we find that even if we were to discount Finnigan's identification of Meyers as her attacker, we would find that the DNA evidence in this case overwhelmingly supports the jury verdict. See State v. Hunter,169 Ohio App.3d 65, 2006-Ohio-5113, at ¶ 24 (finding the appellant's argument that "the jury clearly lost its way in giving credence to the DNA results when literally no other evidence linked appellant to the crime[,]" not well taken.)
 {¶ 25} Based on the foregoing, we cannot find that Meyers' conviction was against the manifest weight of the evidence. As this Court has disposed of Meyers' challenge to the weight of the evidence, we similarly dispose of his challenge to its sufficiency on these claims.Roberts, supra, at *5. Thus, Meyers' first and second assignments of error are overruled.
 ASSIGNMENT OF ERROR III "[MEYERS'] DUE PROCESS, 14TH AMENDMENT RIGHTS UNDER THE U.S. CONSTITUTION WERE VIOLATED BY THE TRIAL COURT'S SUA SPONTE ORDER THAT FINGERNAIL SCRAPINGS BE TESTED FOR DNA BY BCI, THUS ASSUMING THE ROLE OF PROSECUTOR VIOLATING [MEYERS'] RIGHTS."
 {¶ 26} In his third assignment of error, Meyers contends that his due process rights were violated by the trial court's sua sponte order that fingernail *Page 13 
scrapings be tested for DNA by BCI, thus assuming the role of prosecutor, violating his rights. We do not agree.
 {¶ 27} On January 2, 2007, the trial court held a pretrial. At this pretrial, Meyers' counsel stated that he anticipated hiring a DNA expert and indicated that he had made a motion to the court to expend funds to hire such an expert. Specifically, Meyers' counsel explained, "the victim testified that she scratched the defendant on his back. And they have taken DNA samples from her fingernails, which they did not analyze against the DNA they found in the semen." Further, Meyers' counsel stated, "I don't believe the DNA on the fingernails is going to match." The trial court stated, "the Court will appoint an expert for DNA. You want an analysis for both the fingernail scrapings and the semen?" Meyers' counsel answered in the affirmative. Finally, at the March 2, 2007 pretrial, the court stated;
 "all along we were talking about testing; that the fingernail scrapings have never been tested; that there was a theory they would be exculpatory and that it would be the DNA of somebody else and that would be used at your defense and that you wanted them tested for that purpose. I ordered they be tested but not by a separate expert. But had they come back as exculpatory, in other words, if it was somebody else's DNA in the materials with the fingernail scrapings, then that was going to be used as part of your defense. I mean, that's what was discussed. Is that correct, counsel?"
 {¶ 28} Meyers' counsel answered: "That's correct, Your Honor. That's my recollection of it as well." *Page 14 
 {¶ 29} Accordingly, it is clear that the trial court acted at Meyers' request that the fingernail scrapings be tested. As such, Meyers' argument that the trial court sua sponte ordered the test and assumed the role of the prosecutor is without merit.
 {¶ 30} Meyers' third assignment of error is overruled.
 ASSIGNMENT OF ERROR IV "THE TRIAL COURT COMMITTED PLAIN AND REVERSIBLE ERROR IN TIS [SIC] FAILURE TO DISMISS THE CASE AS [MEYERS] WAS NOT AFFORDED HIS RIGHT TO SPEEDY TRIAL AS GRANTED BY SECTION 2945.71 OF REVISED CODE, ARTICLE ONE SECTION 10 OF THE IOHIO [SIC] AND THE 6TH AND 14TH AMENDMENT[S] OF THE UNITED SATTES [SIC] CONSTITUTION."
 {¶ 31} In his fourth assignment of error, Meyers contends that the trial court committed plain and reversible error in its failure to dismiss the case as he was not afforded his right to a speedy trial. We do not agree.
 {¶ 32} Both the United States Constitution and Section 10, Article I
of the Ohio Constitution guarantee a criminal defendant the right to a speedy trial. State v. Pachay (1980), 64 Ohio St.2d 218, 219-20. Further, the courts must strictly enforce such rights. Id. at 221. This "strict enforcement has been grounded in the conclusion that the speedy trial statutes implement the constitutional guarantee of a public speedy trial." Id., citing State v. Pudlock (1975), 44 Ohio St.2d 104, 105.
 {¶ 33} R.C. 2945.71 dictates the time limits within which a defendant must be brought to trial. Under R.C. 2945.71(C)(2), a person charged with a felony *Page 15 
"[s]hall be brought to trial within two hundred seventy days after the person's arrest." R.C. 2945.71(E) further provides that each day a person is held in jail in lieu of bail counts as three days. Pursuant to R.C. 2945.73(B), if a defendant is not brought to trial within the prescribed time period, the trial court must discharge the defendant upon motion for dismissal prior to or at the commencement of trial. However, the time within which a defendant must be brought to trial can be tolled.
 {¶ 34} R.C. 2945.72(E) provides that the statutorily prescribed time for a speedy trial may be lengthened by any period of delay necessitated by a motion instituted by the accused. Further, the time can be tolled by a continuance granted on the accused's own motion, or by any reasonable period granted other than on a motion by the accused. R.C.2945.72(H). See, also, State v. Hamlet, 9th Dist. No. 04CA008527,2005-Ohio-3110, at ¶ 15.
 {¶ 35} Meyers was arrested on October 20, 2006. He was in custody from October 21, 2006 to March 27, 2007, for a total of 157 days. Due to the triple count provision set forth in R.C. 2945.71(E), the State had 90 days, exclusive of tolling, in which to bring Meyers to trial. State v.Price, 9th Dist. No. 07CA0003-M, 2007-Ohio-2252, at ¶ 47.
 {¶ 36} Meyers raised the speedy trial issue prior to the commencement of trial by way of objection. We note that he never raised any particulars with regard to his objection, nor did he attempt to set forth the timeframe in which he believed *Page 16 
the trial court should have tried him. Regardless, our review of the record shows that Meyers' speedy trial rights were not violated.
 {¶ 37} We count the 73 days between October 21, 2006 and January 2, 2007 against the State. On January 2, 2007, Meyers filed a "Motion to Expend Funds to Hire DNA Expert." At a hearing held the same day, the trial court granted the motion. As to the original trial date of January 11, 2007, Meyers' counsel stated, "I don't think we're going to be able to do that in the meantime. My client — I have discussed this with my client and he is going to waive his speedy trial rights." The trial court then stated that it would wait to see how long the requested DNA analysis would take before it would continue the trial. The trial court held a hearing on January 10, 2007 to set a new trial date. Meyers indicated that he understood that he was waiving his speedy trial rights. We find that under R.C. 2945.72(E) and (H), Meyers' January 2, 2007 motion tolled the speedy trial time. The speedy trial time period was tolled from January 2, 2007 until the rescheduled trial, set on March 6, 2007.
 {¶ 38} Prior to the March 6 trial date, the State filed a motion to continue based in part on the fact that the DNA analysis Meyers requested would not be complete until March 5. Further, the State explained that a key witness would be out-of-town. The trial court granted the State's request, but did not set a new date. However, on March 5, 2007, well within the speedy trial limit, the trial court sua sponte continued trial until March 27, 2007 due to scheduling conflicts between *Page 17 
the State, Meyers' counsel, and the trial court. Specifically, the journal entry notes that "[t]his is the first available date with the Court and counsel." The record contains a transcript of the trial court's attempt to reschedule the trial. According to the transcript, Meyers' counsel was out of the country for a week, a key witness for the State was out of town for several days, the trial court had a murder trial on its docket, and the trial judge was having surgery.
 {¶ 39} Under R.C. 2945.72(H), the speedy trial time can be tolled for a reasonable period when a continuance is granted. When a continuance is granted on the State's motion or by the trial court sua sponte, we must determine if the continuance was reasonable in order to toll the statutory speedy trial limit under R.C. 2945.72(H). Akron v.Robinson (Apr. 3, 2002), 9th Dist. No. 20674, at *3. "The reasonableness of a continuance is determined by examining the purpose and length of the continuance." State v. Berner, 9th Dist. No. 3275-M, 2002-Ohio-3024, at ¶ 10, citing State v. Lee (1976), 48 Ohio St.2d 208, 210. Further, a sua sponte continuance "must be accompanied by a journal entry made prior to the expiration of the statutory speedy trial limit[,]"and must explain the reasoning for the continuance. Berner, supra, at ¶ 11, citing State v. Mincy (1982), 2 Ohio St.3d 6, syllabus.
 {¶ 40} We find that, in this case, the continuance was a reasonable extension of the speedy trial limit. Accordingly, Meyers' fourth assignment of error is overruled. *Page 18 
 ASSIGNMENT OF ERROR V "THE COURT IMPROPERLY FAILED TO DECALRE [SIC] A MISTRIAL AFTER TWO JURORS WERE WITNESSED AND CONFIRMED TO HAVE COMMUNICATIONS WITH A WITNESS PREPARING TO TESTIFY IN THE CAPTIONED CASE ON BREAK; THE TRIAL COURT IMPROPERLY DENIED [MEYERS'] CRIMINAL RULE 33 MOTION FOR NEW TRIAL."
 {¶ 41} In his fifth assignment of error, Meyers contends that the trial court improperly failed to declare a mistrial after two jurors were witnessed and confirmed to have communicated with a witness preparing to testify in this case, and that the trial court improperly denied his Crim.R. 33 motion for a new trial. We do not agree.
 {¶ 42} At the outset, we note that Meyers failed to request a mistrial during trial. "The Ohio Supreme Court has found that where, as here, the defense did not expressly request the alleged juror misconduct to be remedied at trial or express some form of dissatisfaction with the way the trial court handled the matter, in the absence of plain error, the claim is waived." State v. Terry, 9th Dist. No. 23043, 2007-Ohio-6790, at ¶ 9, citing State v. McKnight, 107 Ohio St.3d 101, 2005-Ohio-6046, at ¶ 185. Our review of the record shows that Meyers failed to preserve this issue for appeal and has not requested that we review the issue for plain error. Further, Meyers has not demonstrated why we should delve into this issue for the first time on appeal. See In re L.A.B., 9th Dist. No. 23309, 2007-Ohio-1479, at ¶ 19. *Page 19 
 {¶ 43} We note that Meyers also appears to urge this Court to find some misconduct on the part of the trial court. Specifically, Meyers contends that "[t]he [c]ourt should have individually voire (sic) dired the individual jurors, examined the conversation, and proceeded further at that point. *** The [c]ourt should have at least spoken to jurors themselves." We find no merit in this contention. "`There is no per se rule requiring an inquiry in every instance of alleged juror misconduct.'" State v. Sanders (2001), 92 Ohio St.3d 245, 253, quotingUnited State v. Hernandez (C.A.11, 1991), 921 F.2d 1569, 1577. Again, we point to the fact that Meyers did not request the trial court to take any action on this issue at trial, nor did he express any dissatisfaction with the way the trial court handled the matter. We find that he has forfeited this argument for appeal.
 {¶ 44} Meyers further argues that the trial court erred in denying his motion for a new trial. A trial court's ruling on a motion for a new trial under Crim.R. 33 will be reversed only for an abuse of discretion.State v. Haddix (1994), 93 Ohio App.3d 470, 480. The essential inquiry is whether the substantial rights of the accused are adversely or materially affected. Crim.R. 33(A). A defendant may move for a new trial under Crim.R. 33(A) upon a showing of one of six grounds; one of those bases is juror misconduct. Crim.R. 33(A)(2). According to the transcript, "[t]he Court [was] advised that certain jurors approached a police officer during a recess and inquired as to whether or not the patrol division was part of the police force." The trial court admonished the jury not to "make any *Page 20 
kind of independent inquiry, ask any questions of anyone related to the matters in this case. Again, your conduct is essential in assuring the fairness of this trial."
 {¶ 45} Meyers does not, in either his motion to dismiss below or on appeal, specifically argue or support any argument that this contact adversely or materially affected any of his material rights. We decline to create an argument for him. Cardone v. Cardone, (May 6, 1998), 9th Dist. No. 18349, at *8 ("If an argument exists that can support [Appellant's contentions], it is not this court's duty to root it out").
 {¶ 46} Accordingly, Meyers' fifth assignment of error is overruled.
 ASSIGNMENT OF ERROR VI "THE TRIAL COURT IMPROPERLY ADMITTED OVER DEFENSE OBJECTION THE EVIDENCE OF RAPE KIT, ANS [SIC] THERE WAS NO FOUNDATION LAID THAT EXHIBITED A PROPER CHAIN OF CUSTODY, AND THE COURT SHOULD HAVE STRICKEN PER REQUEST OF DEFENSE THE TESTIMONY OF THE DNA CONSULTING EXPERT WHOM HAD NO PERSONAL KNOWLEDGE AS TO WHAT SHE WAS TESTIFYING TO AND RELIED EXCLUSIVELY UPON BCI FOR THE TESTING AND RESULTS."
 {¶ 47} In his sixth assignment of error, Meyers contends that the trial court improperly admitted, over defense objection, the rape kit as there was no foundation laid that exhibited a proper chain of custody. Meyers further contends that the court should have stricken, per his request, the testimony of the DNA consulting expert who had no personal knowledge as to what she was testifying to and relied exclusively upon BCI for the testing and results. We do not agree. *Page 21 
 {¶ 48} A trial court possesses broad discretion with respect to the admission of evidence. State v. Maurer (1984), 15 Ohio St.3d 239, 265. An appellate court will not disturb evidentiary rulings absent an abuse of discretion. State v. Roberts, 156 Ohio App.3d 352, 2004-Ohio-962, at ¶ 14. Meyers first contends that the trial court abused its discretion by admitting the rape kit when the State did not present evidence as to the chain of custody. This argument is without merit.
 {¶ 49} The chain of custody relates to the authentication or identification process set forth in Evid. R. 901(A), which provides: "the requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Evid.R. 901(A). The State carries the burden to prove chain of custody. State v. Artrip (Aug. 22, 2001), 9th Dist. No. 3122-M, at *4, citing State v. Barzacchini (1994), 96 Ohio App.3d 440, 458. "The state is not required to prove a perfect, unbroken chain of custody."State v. Semedo, 5th Dist. No. 2006-CA-00108, 2007-Ohio-1805, at ¶ 12. It appears Meyers would have this Court find that there was a break in the chain of custody from the time it was initially tested by BCI in 2002 to the time the evidence was resubmitted in 2007. "A break in the chain of custody, if any, goes to the weight or credibility of the evidence, and not its admissibility." Id. As Meyers is arguing admissibility and not weight, his chain of custody argument does not support a finding that the trial court abused its discretion in admitting the rape kit. Id. *Page 22 
 {¶ 50} Next, Meyers argues that the court should have stricken Dr. Word's testimony when he objected at trial. We first note that at trial Meyers' counsel requested that Dr. Word's testimony be stricken as unresponsive to his question. Counsel asked if she had "firsthand knowledge of the large number of sperm that you testified to[.]" Dr. Word answered that she "did not see those samples. I'm relying on [BCI's] information to perform the test that we performed in our laboratory." We find that this answer was responsive to Meyers' question.
 {¶ 51} Regardless of the phrasing of his assignment of error, Meyers appears to argue that "[h]er testimony was pure speculation and hypothesis relying on another's testing[,]" not that it should have been stricken as unresponsive. Meyers did not specifically argue at trial that Dr. Word's testimony on the sperm count should have been struckbecause it was not based on first hand knowledge. Rather, he argued that the testimony should have been struck based on the fact that Dr. Word's answer was unresponsive to his question as to whether she had first hand knowledge. Evid.R. 103(A)(1) ("In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record stating the specific ground of objection, if the specific ground was not apparent from the context[.]") Accordingly, we find that Meyers has forfeited this argument on appeal. In Re Swader (Feb. 5, 2001), 12th Dist. No. CA2000-04-036, at *7. Even if we were to disregard this flaw, we would note that Violi similarly testified to the large amount of sperm found in the rape kit. As such, we find that the outcome of *Page 23 
the trial would have been the same. Therefore Meyers' sixth assignment of error is overruled.
 ASSIGNMENT OF ERROR VII "THE TRIAL COURT FAILED TO CONSIDER THE PRINCIPLES OF SENTENCING, PER R.C. 2929.11 AND FAILED TO BALANCE THE FACTORS OF SERIOUSNESS AND RECIDIVISM PURSUANT TO R.C. 2929.12."
 ASSIGNMENT OF ERROR VIII "THE TRIAL COURT IMPROPERLY SENTENCED [MEYERS'] TO [AN] 18 YEAR TERM, AS THE COURT UNCONSTITUTIONALLY FOUND FACTS BY A PREPONDERANCE OF THE EVIDENCE EXPOSING [MEYERS'] TO AN ELEVATED UPPER TERM SENTENCE, THAT WAS ABOVE AND BEYOND THE STATUTORY MAXIMUM FOR THAT CHARGES [SIC] AND UNCONSTITUTIONALLY RAN THEM CONSECUTIVELY, THUS VIOLATING [MEYER'S] RIGHT TO A JURY TRIAL."
 {¶ 52} In Meyers' seventh and eighth assignments of error, he contends that the trial court committed several errors in his sentencing. We do not agree.
 {¶ 53} Initially we note that Meyers failed to object to the constitutionality of his sentence at trial. See State v.Dudukovich, 9th Dist. No. 05CA008729, 2006-Ohio-1309; State v.Payne, 114 Ohio St.3d 502, 2007-Ohio-4642. However, as he argues this same issue in his ineffective assistance of counsel argument below, we will address these assignments of error on their merits.
 {¶ 54} In State v. Foster, 109 Ohio St.3d 1, 2006-Ohio-856, the Court found that Ohio's sentencing structure was unconstitutional to the extent that it required judicial fact-finding. Id. at paragraphs one through seven of the syllabus. *Page 24 
In constructing a remedy, the Court excised the portions of the statute it found to offend the Sixth Amendment and thereby granted full discretion to trial court judges to sentence defendants within the bounds prescribed by statute. See Id.; Dudukovich, supra at ¶ 19.
 {¶ 55} This Court reviews Meyers' sentence utilizing an abuse of discretion standard. Dudukovich at ¶ 12. The Foster Court noted that "there is no mandate for judicial fact-finding in the general guidance statutes. The court is merely to `consider' the statutory factors."Foster, at ¶ 42. Moreover, post-Foster, it is axiomatic that "[t]rial courts have full discretion to impose a prison sentence within the statutory range and are no longer required to make findings or give their reasons for imposing maximum, consecutive, or more than the minimum sentences." Id. at paragraph seven of the syllabus. Therefore,post-Foster, trial courts are still required to consider the general guidance factors in their sentencing decisions. In its journal entry, the trial court specifically stated that it had considered the purposes and principles of sentencing under R.C. 2929.11 and balanced the seriousness and recidivism factors under R.C. 2929.12. The trial court additionally stated that it had considered the record and oral statements when making its decision.
 {¶ 56} R.C. 2929.11 provides in pertinent part as follows:
 "(A) A court that sentences an offender for a felony shall be guided by the overriding purposes of felony sentencing. The overriding purposes of felony sentencing are to protect the public from future crime by the offender and others and to punish the offender. To *Page 25 
achieve those purposes, the sentencing court shall consider the need for incapacitating the offender, deterring the offender and others from future crime, rehabilitating the offender, and making restitution to the victim of the offense, the public, or both.
 "(B) A sentence imposed for a felony shall be reasonably calculated to achieve the two overriding purposes of felony sentencing set forth in division (A) of this section, commensurate with and not demeaning to the seriousness of the offender's conduct and its impact upon the victim, and consistent with sentences imposed for similar crimes committed by similar offenders."
 {¶ 57} Meyers was convicted of two first degree felonies. Accordingly, the trial court was permitted to utilize its discretion to sentence him within the range of three to ten years of incarceration for each conviction. R.C. 2929.14(A)(1). Meyers was sentenced to ten years of incarceration on the rape conviction, and eight years of incarceration on the kidnapping conviction. Accordingly, Meyers' convictions fall within the statutory ranges set forth in R.C. 2929.14.
 {¶ 58} Upon review, this Court cannot say that the trial court abused its discretion in sentencing Meyers to 18 years of incarceration. The evidence shows that Meyers jumped from behind a bush and, along with another man, attacked and raped Finnigan. Finnigan suffered physical and psychological damage for which Meyers exhibited no remorse. R.C.2929.12(B)(2) and (D)(5). Finally, Meyers had multiple serious prior convictions. R.C. 2929.12(E)(2).
 {¶ 59} Therefore, based upon a consideration of the factors in R.C.2929.12 and the purpose of felony sentencing as contained in R.C.2929.11, we cannot say *Page 26 
that the trial court abused its discretion in sentencing Meyers to 18 years of incarceration. Meyers' seventh and eighth assignments of error are overruled.
 ASSIGNMENT OF ERROR IX "THE SENTENCING OF [MEYERS'], WITHOUT MAKING THE FINDS [SIC] REQUIRED BY R.C. 2929.14(B)(C) AND R.C. 2929.14(E), AFTER THE SEVERANCE IN FOSTER OPERATED AS AN EX POST FACTO LAW AND DENIED [MEYERS'] DUE PROCESS."
 {¶ 60} In his ninth assignment of error, Meyers contends that his sentence operated as an ex-post facto law and denied him of due process. We do not agree.
 {¶ 61} Meyers asserts that the remedy outlined in Foster violates the ex-post facto and due process clauses of the U.S. Constitution because it "does increase a defendant's punishment." We are obligated to follow the Ohio Supreme Court's directive and we are, therefore, bound byFoster. Furthermore, we are confident that the Supreme Court would not direct us to violate the Constitution. See U.S. v. Wade (C.A.8, 2006),435 F.3d 829, 832 (holding that the Eighth Circuit is required to follow the directive of the U.S. Supreme Court and presumes that the U.S. Supreme Court would not order a court to violate the Constitution). As this Court cannot overrule or modify Foster, we decline to consider Meyers' challenges thereto. Meyers' ninth assignment of error is overruled. *Page 27 
 ASSIGNMENT OF ERROR X "[MEYERS'] RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL AND THIS VIOLATED [HIS] SIXTH AMENDMENT RIGHT TO COUNSEL."
 {¶ 62} In his tenth assignment of error, Meyers contends that he received ineffective assistance of counsel in violation of thesixth amendment right to counsel. We do not agree.
 {¶ 63} In evaluating an ineffective assistance of counsel claim, this Court employs the two step process as described in Strickland v.Washington (1984), 466 U.S. 668, 687. First, the court must determine whether there was a "substantial violation of any of defense counsel's essential duties to his client." State v. Bradley (1989),42 Ohio St.3d 136, 141; State v. Lytle (1976), 48 Ohio St.2d 391, 396. Second, the court must determine if prejudice resulted to Meyers from his counsel's ineffectiveness. Bradley, 42 Ohio St.3d at 141-142, citingLytle, 48 Ohio St.2d at 396-397. Prejudice exists where there is a reasonable probability that the trial result would have been different but for the alleged deficiencies of counsel. Bradley, 42 Ohio St.3d at paragraph three of the syllabus. Meyers bears the burden of proof, and must show that his "`counsel's errors were so serious as to deprive [him] of a fair trial, a trial whose result is reliable.'" State v.Colon, 9th Dist. No. 20949, 2002-Ohio-3985, at ¶ 48, quotingStrickland, 446 U.S. at 687.
 {¶ 64} We may "analyze the prejudice prong of the Strickland test alone if such analysis will dispose of a claim of ineffective assistance of counsel on the *Page 28 
ground that the defendant did not suffer sufficient prejudice."State v. Kordeleski, 9th Dist. No. 02CA008046, 2003-Ohio-641, at ¶ 37, citing State v. Loza (1994), 71 Ohio St.3d 61, 83 (overruled on other grounds).
Failure to object at sentencing: {¶ 65} As we explained in our disposition of Meyers' seventh, eighth, and ninth assignments of errors, Meyers cannot show that he suffered any prejudice from his trial counsel's failure to object at sentencing. Therefore, Meyers has not met his burden to demonstrate that had his counsel objected to the sentence, the trial court would have reconsidered sentencing him to more than the minimum sentence.
Failure to request an investigator to investigate the crimescene: {¶ 66} Meyers contends that he was prejudiced by his counsel's failure to request an investigator to investigate the crime scene. InStrickland, the United States Supreme Court determined that "counsel has a duty to make reasonable investigations" and the "particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Strickland, 466 U.S. at 691.
 "The Strickland holding *** only require[s] trial counsel to perform a reasonable investigation, not to hire an investigator. Appellant's assignment of error only argues trial counsel's failure to hire an investigator, not trial counsel's failure to investigate. An attorney's decision not to hire an investigator does not equate to a failure to investigate and result in ineffective assistance of counsel." (Emphasis omitted.) State v. Hairston, 9th Dist. No. 05CA008768, 2006-Ohio-4925, at ¶ 36, citing State v. Scott (Sept. 29, 1988), 10th *Page 29 
Dist. No. 88AP-346, at *6; State v. Suttles (Feb. 27, 1995), 4th Dist. No. 94CA9, at *3.
Accordingly, we do not find Meyers' counsel was ineffective for not hiring an investigator.
Failure to file motion to suppress/motion in limine on DNAevidence: {¶ 67} Typically, the decision not to file a motion to suppress or other pre-trial motion does not constitute ineffective assistance of counsel "when doing so was a tactical decision, there was no reasonable probability of success, or there was no prejudice to the defendant."State v. Nields (2001), 93 Ohio St.3d 6, 34.
 {¶ 68} In the instant case, we find that trial counsel was not ineffective for failing to file a motion to suppress or a motion in limine regarding the DNA evidence. We first note that Meyers has not made any argument regarding the probability of success on these motions. Even in reviewing his arguments, we find that the DNA evidence was properly admitted and as such, any pretrial motions attempting to suppress or limit the evidence would have been futile.
 {¶ 69} Meyers specifically contends that the DNA came from the rape kit, and the results could not be "dated, nor be concluisive [sic] on the sexual activity occurring when alleged."
 "The purpose and effect of a motion to suppress and a motion in limine are distinct. A `motion to suppress' is defined as a `device used to eliminate from the trial of a criminal case evidence which has been secured illegally, generally in violation of the Fourth Amendment (search and seizure), the Fifth Amendment (privilege against self incrimination), or the Sixth Amendment (right to assistance of counsel, right of confrontation etc.), of *Page 30 
U.S. Constitution.'" State v. Baker, 170 Ohio App.3d 331, 2006-Ohio-7085, at ¶ 7, quoting, State v. French (1995), 72 Ohio St.3d 446, 449.
 {¶ 70} A party seeks to suppress evidence, "including but not limited to statements and identification testimony, on the ground that it was illegally obtained." Crim.R. 12(C)(3). Meyers' argument on appeal seems to go to the weight of the evidence, not that it was in any way illegally obtained or that it should have been limited. Meyers does not deny that the DNA in the rape kit belonged to him. As we discussed in our resolution of his first assignment of error, we find that the jury was entitled to ignore Meyers' argument that "the rape if at all, occurred by another individual whom did not ejaculate." Accordingly, we overrule this portion of Meyers' assignment of error.
Contact with defendant: {¶ 71} Meyers contends that his counsel failed to properly prepare for trial as he had almost no contact with the defendant. We note that Meyers informed the trial court that his counsel had not been to the jail to discuss the case or talk with him. The trial court stated that "he's given me a pretty extensive description of the evidence and the case and he seems to know a lot about it." Further, at the conclusion of his representation, Meyers' trial counsel submitted a request for appointed counsel fees and expenses for a total of 61 hours on the case. Of the 61 hours, 42.90 hours were spent out-of-court. The trial court granted Meyers' counsel's motion for extraordinary fees. There is nothing in the record to indicate how much of this time was spent with Meyers, nor to support Meyers' argument *Page 31 
that his attorney "had almost no contact with [him]." Meyers bears the burden of proof to show that his "counsel's errors were so serious as to deprive [him] of a fair trial, a trial whose result is reliable."Colon, supra, at ¶ 48, quoting Strickland, 446 U.S. at 687. We find that Meyers has not sustained this burden.
Jury misconduct: {¶ 72} Lastly, Meyers argues that his trial counsel was ineffective for failing to request a mistrial after it was determined that two jurors asked a State witness a question during a break. Again, as we stated in our disposition of Meyers' fifth assignment of error, our review of the record does not indicate that any prejudice occurred from this incident.
 {¶ 73} Meyers' tenth assignment of error is overruled.
 ASSIGNMENT OF ERROR XI "THE TRIAL COURT ERRED WHEN IT CLASSIFIED [MEYERS'] AS A SEXUAL PREDATOR AS IT DENIED [HIM] DUE PROCESS BECAUSE IT FAILED TO PRODUCE CLAEAR [SIC] AND CONVINCING EVIDENCE THAT THERE WAS A LIKIHOOD [SIC] THAT HE WOULD COMMIT FUTURE SEX CRIMES."
 {¶ 74} In his eleventh assignment of error, Meyers contends that the trial court erred when it classified him as a sexual predator as it denied him due process because it failed to produce clear and convincing evidence that there was a likelihood that he would commit future sex crimes. We do not agree.
 {¶ 75} We first note that Meyers argues that the trial court improperly conducted the sexual designation hearing after his sentencing. This issue was not *Page 32 
properly assigned as error and therefore, we may disregard it. However, drafting flaw aside, we find that this argument is without merit. We find that the trial court could properly hold the sexual classification hearing after his sentencing hearing. See State v. Bellman (1999),86 Ohio St.3d 208, 210 (finding that the provision that the hearing shall be held before sentencing is not jurisdictional); see, also, State v.Webb, 9th Dist. No. 06CA008875, 2006-Ohio-5476, at ¶ 5 (stating that because the statutory time requirement in R.C. 2950.09(B)(1) is merely directory, the trial court had jurisdiction to hold a hearing after sentencing).
 {¶ 76} The Ohio Supreme Court has recently found
 "that the sex-offender-classification proceedings under R.C. Chapter 2950 are civil in nature and that a court of appeals must apply the civil manifest-weight-of-the-evidence standard in its review of the trial court's findings. Under this standard, a court of appeals must affirm the trial court's determination if it is supported by some competent, credible evidence." State v. Wilson, 113 Ohio St.3d 382, 2007-Ohio-2202, at ¶ 32.
 {¶ 77} Under the civil manifest weight of the evidence standard,
 "a court has an obligation to presume that the findings of the trier of fact are correct. This presumption arises because the trial judge had an opportunity to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony. A reviewing court should not reverse a decision simply because it holds a different opinion concerning the credibility of the witnesses and evidence submitted before the trial court. A finding of an error in law is a legitimate ground for reversal, but a difference of opinion on credibility of witnesses and evidence is not." (Internal citations and quotations omitted.) Id. at ¶ 24. *Page 33 
 {¶ 78} R.C. 2950.01(E)(1) defines a sexual predator as an individual who "has been convicted of or pleaded guilty to committing a sexually oriented offense that is not a registration-exempt sexually oriented offense and is likely to engage in the future in one or more sexually oriented offenses." In making this determination, a trial court must consider all relevant factors, including the factors contained in R.C.2950.09(B)(3). While the trial court must consider all the factors listed in R.C. 2950.09(B)(3), not every factor need be established before an individual is adjudicated a sexual predator. State v.Smith (June 2, 1999), 9th Dist. No. 18622, at *2.
 {¶ 79} In the instant case, Meyers requested that a sexual predator evaluation report be completed on the issue of whether he was likely to reoffend. At the sexual offender classification hearing, Meyers' counsel explained that "[f]or purposes of this hearing, Your Honor, we're going to argue the different factors that relate to the sexual predator hearing. I would stipulate to the contents of that report for that purpose." According to the evaluation report, evaluators use an actuarial instrument designed to estimate the probability of sexual recidivism. Meyers was placed in the "medium-high" risk category. The report further explained that 33% of people who obtained a similar score as Meyers will reoffend within five years; 38% within ten years, and 40% within 15 years. The clinical psychologist authoring the report indicated the facts showed that Meyers had deviant sexual preferences, prior offenses as a juvenile and adult, antisocial *Page 34 
personality disorder, and that he and Finnigan were unrelated were most significantly correlated with sexual offense recidivism.
 {¶ 80} Along with this report, the trial court indicated on the record "in consideration of the factors in 2950.09" that it considered that Finnigan was only 21 years old at the time of the rape. Further, it considered the fact that there were two assailants that perpetrated the rape. The court noted that
 "I did consider quite significant the nature of the sexual activity or interaction between the defendant and the victim. The fact that the defendant, according to the testimony presented here today, and this co-offender dragged the victim into a bush — tree, bushy area while she was walking alone at night. Both of these men sexually assaulted her. One by restraining her, the defendant by vaginally raping her. The Court finds *** the victim and the defendant in this case were not related and this was, in fact, stranger-on-stranger rape. Also, in considering cruelty or threats of cruelty, *** [t]he defendant, according to testimony called the victim a bitch, slapped her, otherwise assaulted her. Defendant indicated and told the victim that he had AIDS in response to her attempts to try to free herself from the situation. Evidence was presented that the victim had numerous bruises, scratches, abrasions; that she was shaken, taken to the hospital by law enforcement[.]"
 {¶ 81} Finally, the trial court noted that Meyers had an extensive criminal record. Due to the factors it listed, the trial court found that Meyers was "likely to engage in the future in one or more sexually-oriented offenses as defined by statute." Therefore, the trial court determined that Meyers was a sexual predator. We find that this determination is supported by competent, credible evidence and that the trial court properly considered the factors in R.C. 2950.09. Accordingly, Meyers' eleventh assignment of error is overruled. *Page 35 
 III. {¶ 82} Meyers' assignments of errors are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
 Costs taxed to Appellant. *Page 36 
 SLABY, J DICKINSON, J. CONCUR *Page 1