[Cite as *State v. Wingate*, 2013-Ohio-2079.]

STATE OF OHIO          )                IN THE COURT OF APPEALS
                     )ss:           NINTH JUDICIAL DISTRICT
COUNTY OF SUMMIT    )

STATE OF OHIO                   C.A. No.     26433

     Appellee

     v.                               APPEAL FROM JUDGMENT
                                    ENTERED IN THE
JULIE M. WINGATE            COURT OF COMMON PLEAS
                                    COUNTY OF SUMMIT, OHIO
     Appellant                CASE No.     CR 10 21 3461

DECISION AND JOURNAL ENTRY

Dated: May 22, 2013

MOORE, Presiding Judge.

{¶1} Defendant, Julie Wingate, appeals from her conviction in the Summit County Court of Common Pleas. We affirm.

I.

{¶2} From 2007 to 2009, Ms. Wingate served as the treasurer for the Cuyahoga Falls South Little League ("the League"). In 2011, the Summit County Grand Jury indicted Ms. Wingate on a charge of grand theft, in violation of R.C. 2913.02(A)(1)/(A)(2)/(A)(3), for allegedly depriving the League of a portion of its funds. Ms. Wingate pleaded not guilty to the charge, and the case proceeded to a jury trial. The jury found Ms. Wingate guilty, and the trial court imposed sentence in an entry issued on April 17, 2012. Ms. Wingate timely appealed from the sentencing entry, and she now presents five assignments of error for our review. We have re-ordered the assignments of error to facilitate our discussion.

II.

## ASSIGNMENT OF ERROR IV

THE TRIAL COURT ERRED IN OVERRULING [MS. WINGATE'S] RULE 29 MOTION AS THERE WAS NOT SUFFICIENT EVIDENCE TO CONVICT [HER].

{¶3}    In her fourth assignment of error, Ms. Wingate argues that her conviction was not supported by sufficient evidence.  We disagree.

{¶4}    The issue of whether a conviction is supported by sufficient evidence is a question of law, which we review de novo.  *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).  When considering a challenge to the sufficiency of the evidence, the court must determine whether the prosecution has met its burden of production.  *Id.* at 390 (Cook, J. concurring).  In making this determination, an appellate court must view the evidence in the light most favorable to the prosecution:

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt.  The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.  Circumstantial and direct evidence "possess the same probative value[.]"  *Id.* at paragraph one of the syllabus.  "Furthermore, if the State relies on circumstantial evidence to prove any essential element of an offense, it is not necessary for such evidence to be irreconcilable with any reasonable theory of innocence in order to support a conviction."  (Internal quotations omitted.)  *State v. Tran*, 9th Dist. No. 22911, 2006-Ohio-4349, ¶ 13.

**{¶5}** Ms. Wingate was convicted of grand theft in violation of R.C. 2913.02(A)(1)/(A)(2)/(A)(3). The statute provides that:

(A) No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways:

(1) Without the consent of the owner or person authorized to give consent;

(2) Beyond the scope of the express or implied consent of the owner or person authorized to give consent;

(3) By deception[.]

**{¶6}** Here, as part of the State's case-in-chief, it presented the testimony of Kelly Bennett, Bruce Dickon, Patricia Rightley, John Potok, and Detective Chad Lengel.

**{¶7}** Ms. Bennett testified that she held the position of League treasurer commencing in 2006, immediately prior to Ms. Wingate. When Ms. Bennett began her term as treasurer, she opened a bank account for the League utilizing a check in the amount of $10,500 that was provided to her by the previous treasurer. Ms. Bennett would routinely pay for the expenses of the League using checks from this account. She would also reimburse individuals who had paid for League expenses when the individual presented her with a receipt for the purchase. When the League's account grew to $24,000 in 2007, she became uncomfortable handling the increased funds, and she relinquished the position. She then wrote a check to Ms. Wingate, who had taken over the position, for the $24,000 in the account, following the same course as the treasurer before her. She also provided Ms. Wingate with a ledger which listed the withdrawals and deposits from the account.

**{¶8}** Mr. Dickon testified that he was the League's president when Ms. Wingate took over the position of treasurer. Ms. Wingate would occasionally correspond with Mr. Dickon and the League's board members regarding the League's account. In 2009, when he was preparing

to retire as the League's president, he sent Ms. Wingate an email requesting the League's bank statements, a list of outstanding bills, and an accounting from a raffle. Mr. Dickon felt that Ms. Wingate was uncooperative with providing the information, but she later provided him with an itemized ledger. Mr. Dickon testified that the State's Exhibit 6 was the ledger that Ms. Wingate provided him. This exhibit indicates that $1,885.30 was in the League account at that time. After Mr. Dickon made several requests for the bank records to which Ms. Wingate did not respond, Mr. Dickon brought the ledger to the police department to seek assistance in obtaining the rest of the financial records and to determine where the League's funds were utilized. The police department later returned the ledger to him, and he provided it to the League's board.

{¶9} Ms. Rightley testified that she took over as treasurer after Ms. Wingate. When she did so, she received a check for $1,800 from Ms. Wingate. She used this check along with a donation and opened a new account for the League. Ms. Rightley also received outstanding League bills, which exceeded the money remaining in the League's account.

{¶10} Mr. Potok testified that he took over as the League's president when Mr. Dickon resigned, and he continued the investigation of the League's finances. In doing so, he reviewed a ledger that was given to him, which he too identified as Exhibit 6. He provided the ledger to law enforcement.

{¶11} Detective Lengel investigated the League's concerns regarding its funds. When he commenced his investigation, he received the police file that contained a copy of a ledger, which he verified was the ledger contained in State's Exhibit 6. The detective also obtained and reviewed the League's bank records during the time period that Ms. Wingate served as treasurer. These records were also admitted into evidence. Detective Lengel compared the bank records to

the ledger and prepared a list of checks that were not accurately noted on the ledger. The parties have referred to this list interchangeably as Appendix A and Exhibit 12.

{¶12} The detective further testified that, after he prepared this list, he interviewed Ms. Wingate at the police station, where she brought with her a ledger. The detective and Ms. Wingate reviewed their ledgers against each other, and the detective determined that "they were both the same." Ms. Wingate also confirmed that the ledger the detective had was accurate. They then reviewed the ledger line by line. When the detective asked Ms. Wingate what the bank records would show relative to the ledger, she informed him that the records would reveal payments made from the League account to her personal credit card. She informed him that these payments were made to reimburse her for purchases she had made for the League. However, Ms. Wingate acknowledged that she did not have receipts for those purchases. Ultimately, Ms. Wingate advised the detective that "she might have padded some of the credit card payments," by approximately fifty percent over what she was due for reimbursements. The detective asked if there were any payments made to Target from the League account, and she denied that there were. The detective then showed her checks that had been written to Target from the League account and revealed to her that he had obtained the bank records. He further inquired as to several checks that had been made out to "Cash" totaling $2700. Ms. Wingate could not recall why she had obtained those cash withdrawals.

{¶13} In all, Detective Lengel testified to twenty-two checks that he concluded did not coincide with the ledger. These included eight checks which were noted in the ledger as paid to "Gordon Food Services" or "GFS." The bank records demonstrated that two of these checks, totaling $1346.08, had been paid to "Cardmember Services." Four of these checks, totaling $2300, had been paid to "Cash." One of these checks, in the amount of $144.69, was paid to

"Sam's Club." The remaining of these checks, in the amount of $97.42, was paid to "AT-T." The detective also testified to several discrepancies on the ledger of eleven checks which were noted as paid to "Sam's Club." The bank records demonstrated that three of these checks, totaling $1000, were paid to "Cash." Six of these checks, totaling $4675.78, were paid to "Cardmember Services." One of the checks, in the amount of $1600, was paid to "Target." The remaining check, in the amount of $1000, was paid to Ms. Wingate. The detective further noted discrepancies on three other entries: (1) a check in the amount of $1000, which was noted on the ledger as paid to "Cash" for the "Night at the Races," had actually been paid to "Target," (2) a check in the amount of $800 that was noted as paid toward tournaments was paid to "Cash," and (3) a check in the amount of $100, which was noted on the ledger as paid to "Wal-Mart," had actually been paid to "QVC," an online shopping network.

{¶14} The State then submitted into evidence statements from Ms. Wingate's Visa card account. The statements display payments which correlate in amount with seven of the checks written to "Cardmember Services" referenced above, these checks totaling over $5400.

{¶15} In arguing that there was insufficient evidence to support her conviction, Ms. Wingate maintains that it was not beyond the scope of the League's consent for her to make reimbursements to herself through utilization of the League's funds to make her personal payments. However, the above evidence, when viewed in the light most favorable to the State, suggests that she was not due reimbursements. Exhibit 6 references a "[r]e-imbursement" made to another individual in the "FOR" line. The checks in dispute are not indicated on Exhibit 6 as reimbursements. Further, Mr. Dickon testified that he knew of no reason why Ms. Wingate, who had control of the League's funds, would need to "reimburse" herself for League expenses. Moreover, Detective Lengel testified that Ms. Wingate acknowledged that she "padded" the

credit card payments by fifty percent and that she had no explanation for the cash payments. Viewing the above evidence in the light most favorable to the State, we conclude that there existed evidence from which the jury could have reasonably inferred that Ms. Wingate intended to purposefully deprive the League of its property by knowingly exerting control over the League's funds in a way that was beyond the scope of the League's consent, in violation of R.C. 2902.13(A)(2). As Mrs. Wingate was charged with grand theft pursuant to "R.C. 2913.02(A)(1)/(A)(2)/(A)(3)," and as there was sufficient evidence to support a conviction under subsection (A)(2), it is unnecessary to address Ms. Wingate's arguments regarding inapplicability of subsection (A)(1) or regarding deception relative to subsection (A)(3). *See State v. Taylor*, 9th Dist. No. 25490, 2011-Ohio-5009, ¶ 16 (concluding that it was unnecessary to address arguments made relative to R.C. 2911.11(A)(1), when sufficient evidence existed to support the conviction under R.C. 2911.11(A)(2), and where defendant was charged with violation of subsection (A)(1) "and/or" (A)(2)).

{¶16} Accordingly, Ms. Wingate's fourth assignment of error is overruled.

## ASSIGNMENT OF ERROR V

THE TRIAL COURT VIOLATED [MS.] WINGATE'S RIGHTS TO DUE PROCESS AND A FAIR TRIAL WHEN IT ENTERED A JUDGMENT OF CONVICTION FOR THEFT, WHICH WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND SECTION 16, ARTICLE I OF THE OHIO CONSTITUTION.

{¶17} In her fifth assignment of error, Ms. Wingate argues that her conviction was against the manifest weight of the evidence. We disagree.

{¶18} When a defendant asserts that her conviction is against the manifest weight of the evidence:

an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). In making this determination, this Court is mindful that "[e]valuating the evidence and assessing credibility are primarily for the trier of fact." *State v. Shue*, 97 Ohio App.3d 459, 466 (9th Dist.1994), citing *Ostendorf-Morris Co. v. Slyman*, 6 Ohio App.3d 46, 47 (8th Dist.1982) and *Crull v. Maple Park Body Shop*, 36 Ohio App.3d 153, 154 (12th Dist.1987).

{¶19} In support of her fifth assignment of error, Ms. Wingate argues that the weight of the evidence did not establish that she acted outside the scope of the League's consent, because the weight of the evidence did not demonstrate that she personally used the League's funds beyond what she was owed in reimbursements.

{¶20} At trial, Mr. Potok acknowledged that he had utilized the League's debit card for personal expenses at gas stations, but he maintained that he did so in lieu of direct reimbursement for items that he had purchased for the League after being unable to coordinate his schedule with that of Ms. Rightley. Ms. Rightley confirmed that Mr. Potok utilized the League's account to make these purchases and that he did so because she had been unable to coordinate with him to reimburse him for moneys the League owed him.

{¶21} Based upon this testimony, Ms. Wingate has argued that "[t]here was no question as to whether [she] was entitled to reimbursement for funds spent on behalf of the league to stock the concession stand as it was common practice for members to purchase items on behalf of [t]he League, only to obtain reimbursement at a later time." However, here, the record is devoid of evidence that Ms. Wingate made any purchases on behalf of the League utilizing her personal

funds. Based upon the evidence before it, the jury could have determined that many or all of the discrepant checks were utilized for Ms. Wingate's personal purchases, and that these checks did not represent "reimbursements." Mr. Dickon testified that he knew of no reason why Ms. Wingate would need to "reimburse" herself for purchases when she had, and was the only person who had, control of the League's account while she held position of treasurer. Although it is possible that Ms. Wingate made purchases for the League from her own funds and reimbursed herself with League funds in the same amount, based upon our review of the record we cannot say that the jury lost its way in determining otherwise. *See State v. Peasley*, 9th Dist. No. 25062, 2010-Ohio-4333, ¶ 18 ("A conviction is not against the manifest weight because the [trier of fact] chose to credit the State's version of events.").

{¶22} Based upon the foregoing, we conclude that this is not the exceptional case where the jury created a manifest miscarriage of justice in finding Ms. Wingate guilty of grand theft. Accordingly, Ms. Wingate's fifth assignment of error is overruled.

## ASSIGNMENT OF ERROR I

THE TRIAL COURT COMMITTED PREJUDICIAL ERROR WHEN IT ADMITTED EVIDENCE THAT WAS NEVER AUTHENTICATED AND ITS WRONGFUL ADMISSION AFFECTED THE SUBSTANTIAL RIGHTS OF [MS.] WINGATE.

{¶23} In her first assignment of error, Ms. Wingate argues that the trial court erred in admitting Exhibit 6 into evidence, as this exhibit was not properly authenticated. We disagree.

{¶24} Trial courts possess broad discretion in determining the admissibility of evidence. *State v. Maurer*, 15 Ohio St.3d 239, 265 (1984), citing *State v. Hymore*, 9 Ohio St.2d 122, 128 (1967). As such, this court will not overturn a trial court's evidentiary determination in the absence of an abuse of discretion that resulted in material prejudice to the defendant. *State v. Ristich*, 9th Dist. No. 21701, 2004-Ohio-3086, ¶ 9. An "abuse of discretion" connotes that the

trial court was arbitrary, unreasonable, or unconscionable in its ruling. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶25} Evid.R. 901(A) provides:

The requirement of authentication or identification as condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

{¶26} This Court has held that the provision of Evid.R. 901:

merely means that foundational evidence must be sufficient to constitute a rational basis for a jury decision and the primary evidence is what its proponent claims it to be. The proponent need not offer conclusive evidence as a foundation but must merely offer sufficient evidence to allow the question as to authenticity or genuineness to reach the jury. Once the judge determines that the threshold test of authentication has been met and submits the evidence to the jury, the jury may reject the authenticity of the evidence.

(Internal quotations and citations omitted.) *State v. Caldwell*, 9th Dist. No. 14720, 1991 WL 259529, *7 (Dec. 4, 1991). Here, Mr. Dickon testified that Exhibit 6 was the ledger that Ms. Wingate provided to him in response to his request for the financial records. Based upon Mr. Dickon's testimony, there was sufficient evidence to allow the question as to the authenticity of Ms. Wingate's ledger to reach the jury. Accordingly, we cannot say that the trial court abused its discretion in allowing admission of the ledger.

{¶27} However, Ms. Wingate has focused her argument on the traceability of Exhibit 6, arguing that the State did not demonstrate how it came to be in the possession of the police department. "The chain of custody relates to the authentication or identification process set forth in Evid. R. 901(A)[.]" *State v. Meyers*, 9th Dist. No. 23864, 23903, 2008-Ohio-2528, ¶ 49. However, "[t]he [S]tate is not required to prove a perfect, unbroken chain of custody." *Id.*, quoting *State v. Semedo*, 5th Dist. No.2006-CA-00108, 2007-Ohio-1805, ¶ 12. "A break in the chain of custody, if any, goes to the weight or credibility of the evidence, and not its

admissibility." *Meyers* at ¶ 49, quoting *Semedo* at ¶ 12. Because Ms. Wingate's assignment of error pertains to admissibility and not weight, her "chain of custody argument does not support a finding that the trial court abused its discretion in admitting" the ledger. *See Meyers* at ¶ 49.

{¶28} Accordingly, Ms. Wingate's first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

THE TRIAL COURT'S FAILURE TO PREVENT EXCLUDED EVIDENCE FROM REACHING THE JURY DURING CLOSING ARGUMENTS AND DELIBERATION IMPAIRED [MS.] WINGATE'S RIGHT TO A FAIR AND IMPARTIAL JURY.

{¶29} In her second assignment of error, Ms. Wingate argues that the State engaged in prosecutorial misconduct by referencing in closing argument Appendix A, which had been excluded from evidence, and the trial court erred in purportedly allowing Appendix A to be utilized by the jury during deliberations. We disagree.

{¶30} In regard to allegedly improper remarks made by a prosecutor in closing arguments, "[p]arties are granted latitude in closing arguments, and the question as to the propriety of these arguments is generally considered one falling within the sound discretion of the trial court." *State v. Frazier*, 73 Ohio St.3d 323, 341 (1995), quoting *State v. Loza*, 71 Ohio St.3d 61, 78 (1994). An abuse of discretion connotes that a trial court was unreasonable, arbitrary, or unconscionable in its ruling. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). "The test regarding prosecutorial misconduct in closing arguments is whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant." *Frazier* at 341, quoting *State v. Smith*, 14 Ohio St.3d 13, 14 (1984). "However, some latitude is given to both parties in closing arguments so long as the statements are based on evidence adduced at trial." *State v. Partin*, 9th Dist. No. 19819, 2000 WL 960959, *4 (July 12, 2000).

{¶31} Here, at the close of the State's case-in-chief, it offered into evidence Appendix A, which we discussed above in response to Ms. Wingate's fourth assignment of error, consisting of the list prepared by Detective Lengel of the purported discrepancies between the ledger admitted as Exhibit 6 and the bank records. Ms. Wingate objected to the admission of Appendix A, and the Court sustained the objection and excluded it from evidence, finding that it constituted an unnecessary summary. During the State's closing argument, the State referenced "24" League expenditures which Ms. Wingate mislabeled in the ledger. Defense counsel objected to this remark on the basis that there existed no testimony regarding "24" mislabeled items. The State responded by asking, "Have you seen Appendix A?"

{¶32} Ms. Wingate argues that the reference to an excluded exhibit prejudicially affected her substantial rights. However, after the defense objection, which was overruled by the trial court, the State then proceeded to list 22 check numbers for the jury, which it contended were mislabeled in the ledger pursuant to Detective Lengel's testimony. These check numbers coincided with, and were supported by, the detective's testimony. After closing arguments, the trial court instructed the jury that the statements made during closing arguments were not evidence. "In the absence of evidence to the contrary, we presume that the jury followed the trial court's instructions and only considered the evidence properly before it." *State v. Ha*, 9th Dist. No. 07CA0089-M, 2009-Ohio-1134, ¶ 48, citing *State v. Manns*, 169 Ohio App.3d 687, 2006-Ohio-5802, ¶ 93 (2d Dist.). Accordingly, we cannot discern in what manner Ms. Wingate's substantial rights were prejudicially affected by the reference to Appendix A.

{¶33} Further, Ms. Wingate contends that, although Appendix A was excluded from evidence, it was submitted to the jury. Ms. Wingate has reached this conclusion inferentially based upon its inclusion in the appellate record. We decline to adopt the position that an

excluded exhibit that is inexplicably included in the appellate record necessarily was presented to the jury. *See Hutchison v. Henderson*, 9th Dist. No. 20862, 2002-Ohio-4521, ¶ 39, quoting *In re Hiltabidel*, 9th Dist. No. 21009, 2002-Ohio-3627, ¶ 58 ("An appellant bears the burden of affirmatively demonstrating error on appeal.") Accordingly, Ms. Wingate's second assignment of error is overruled.

## ASSIGNMENT OF ERROR III

> THE TRIAL COURT'S COMMENT TO THE JURY WHICH CONTRADICTED WITNESS TESTIMONY WAS PREJUDICIAL TO [MS.] WINGATE'S RIGHT TO A FAIR, IMPARTIAL JURY TRIAL.

{¶34} In her third assignment of error, Ms. Wingate argues that the trial court committed plain error by commenting on the nature of Mr. Potok's testimony. We disagree.

During the defense's closing argument, the following exchange occurred:

> [DEFENSE COUNSEL]: [Mr. Potok] lied in this courtroom. Took over as president, he got issued his own bank card, debit card that he uses at Sheetz, and now he's taken over all the printing, sign making, banner making and uniform printing.
>
> [PROSECUTOR]: Objection.
>
> [DEFENSE COUNSEL]: He testified to that.
>
> [PROSECUTOR]: That wasn't exactly what he testified to.
>
> THE COURT: Sustained. That was not the extent of his testimony.

Ms. Wingate maintains that the objection should not have been sustained because Mr. Potok did testify that he performed all of the printing for the League, and he had been issued a debit card in the name of the League, which he used at Sheetz. Further, Ms. Wingate argues that the comment from the court that this was "not the extent of his testimony" compounded the error. Ms. Wingate contends that in making this comment, the Court indicated its opinion of the content of Mr. Potok's testimony and undermined defense counsel.

**{¶35}** "Challenged statements and actions of the trial judge in a criminal case will not justify a reversal of the conviction, where the defendant has failed in light of the circumstances under which the incidents occurred to demonstrate prejudice." *State v. Wade*, 53 Ohio St.2d 182 (1978), paragraph two of the syllabus, vacated on other grounds 438 U.S. 911 (1978). *See also State v. Demus*, 192 Ohio App.3d 181, 188, 2011-Ohio-124, ¶ 32 (2nd Dist.). In order to determine whether a trial judge's remarks were prejudicial to a defendant, courts apply the following rules:

> (1) The burden of proof is placed upon the defendant to demonstrate prejudice, (2) it is presumed that the trial judge is in the best position to decide when a breach is committed and what corrective measures are called for, (3) the remarks are to be considered in light of the circumstances under which they are made, (4) consideration is to be given to their possible effect upon the jury, and (5) to their possible impairment of the effectiveness of counsel.

*Id.* at 188.

**{¶36}** Here, the court's comment pertained to the testimony of Mr. Potok in regard to his involvement in the League and his utilization of the League account, which did not directly involve Ms. Wingate. Further, as set forth in our discussion of Ms. Wingate's second assignment of error above, the trial court instructed the jury that statements made during closing arguments were not evidence. In addition, the trial court instructed the jury that if it believed the court to have unintentionally expressed its views as to this case to disregard it. Based upon the circumstances of this case and the instructions given by the court, we conclude that Ms. Wingate has not established that she was prejudiced by the trial court's remark, as was her burden. *See id.*

**{¶37}** Accordingly, Ms. Wingate's third assignment of error is overruled.

III.

**{¶38}** Ms. Wingate's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

CARLA MOORE
FOR THE COURT

WHITMORE, J.
HENSAL, J.
CONCUR.


APPEARANCES:

WARNER MENDENHALL, Attorney at Law, for Appellant.

ALYSSA KEENY, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.