[Cite as *State v. Davis*, 2013-Ohio-5226.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| STATE OF OHIO | C.A. No. 26660 |
|---|---|
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| ROBERT A. DAVIS | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | CASE No. CR 12 01 0289 (B) |

DECISION AND JOURNAL ENTRY

Dated: November 27, 2013

WHITMORE, Judge.

{¶1} Defendant-Appellant, Robert Davis, appeals from his convictions in the Summit County Court of Common Pleas. This Court affirms.

I

{¶2} On the afternoon of January 10, 2012, a group of friends were gathered on Davis' porch on Princeton Street. Among this group were Davis, DeMarcus Williams, and Rasheem Carr. Williams, in need of cash, decided to rob Marcus Minter because he knew Minter always had money on him. Williams discussed the plan with Davis and Carr. According to Williams, the plan was that he and Carr would rob Minter and then Davis would drive them to Williams' aunt's house. As part of the plan, Williams testified that Carr parked his mother's Buick Rendezvous in an alley behind Davis' house and gave Davis the keys.

{¶3} Down the street from Davis' house, Minter was sitting in Philip Anderson's car with Alexander Wells. Anderson was in the driver's seat, Minter was in the front passenger's

seat, and Wells was sitting behind Minter. Williams and Carr approached with their guns drawn. According to Williams, as he was robbing Minter, Carr fatally shot Anderson. Williams and Minter ran. Davis was waiting for Williams in the Buick Rendezvous and drove him to Williams' aunt's house. Williams testified that Davis then went back and picked up Carr. When they returned, the three of them divided up the proceeds from the robbery.

{¶4} Williams, Carr, and Davis were indicted. Williams pleaded guilty, and Carr and Davis were tried together. Davis was charged with (1) felony murder, in violation of R.C. 2903.02(B), an unclassified felony, (2) aggravated robbery, in violation of R.C. 2911.01(A)(3), a felony of the first degree, and (3) having weapons while under disability, in violation of R.C. 2923.13, a felony of the third degree. Additionally, the charges of felony murder and aggravated robbery had firearm specifications.

{¶5} A jury found Davis not guilty of having weapons while under disability and the firearm specifications, but guilty of felony murder and aggravated robbery. The court merged the two offenses and sentenced Davis to 15-years-to-life in prison. Davis now appeals and raises four assignments of error for our review. To facilitate the analysis, we rearrange and consolidate several of his assignments of error.

II

Assignment of Error Number Three

THE COURT ERRED BY DENYING THE APPELLANT'S MOTION FOR RULE 29 MOTION FOR ACQUITTAL AND THE VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶6} In his third assignment of error, Davis argues that his convictions are not supported by sufficient evidence and are against the manifest weight of the evidence. We disagree.

**Sufficiency**

{¶7} "'[S]ufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997), quoting *Black's Law Dictionary* 1433 (6th Ed.1990). "In essence, sufficiency is a test of adequacy." *Thompkins* at 386. When reviewing a conviction for sufficiency, evidence must be viewed in a light most favorable to the prosecution. *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. The pertinent question is whether "any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id*.

{¶8} "Whether the evidence is legally sufficient to sustain a verdict is a question of law." *Thompkins* at 386, citing *State v. Robinson*, 162 Ohio St. 486 (1955). This Court, therefore, reviews questions of sufficiency de novo. *State v. Salupo*, 177 Ohio App.3d 354, 2008-Ohio-3721, ¶ 4 (9th Dist.).

{¶9} Davis was convicted of felony murder and aggravated robbery. R.C. 2903.02(B), known as the felony murder statute, provides that "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree * * *."

{¶10} R.C. 2911.01(A)(1), aggravated robbery provides, in relevant part, that "[n]o person, in attempting or committing a theft offense, * * * shall * * * use [a deadly weapon]." Aggravated robbery is an offense of violence and a felony of the first degree. R.C. 2901.01(A)(9)(a) and 2911.01(C). Aggravated robbery, therefore, qualifies as a predicate offense for felony murder.

{¶11} A person need not be the principal offender to be convicted of a crime. R.C. 2923.03(A)(2) provides that "[n]o person, acting with the kind of culpability required for the commission of an offense, shall * * * [a]id or abet another in committing the offense." "To support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal." *State v. Johnson*, 93 Ohio St.3d 240 (2001), syllabus. "The criminal intent of the aider and abettor 'can be inferred from the presence, companionship, and conduct of the defendant before and after the offense is committed.'" *State v. Stephens*, 9th Dist. Summit No. 26516, 2013-Ohio-2223, ¶ 18, quoting *State v. Smith*, 9th Dist. Summit No. 25650, 2012-Ohio-794, ¶ 17. A person who violates R.C. 2923.03(A)(2) is guilty of complicity and "shall be prosecuted and punished as if he were a principal offender. A charge of complicity may be stated in terms of this section, or in terms of the principal offense." R.C. 2923.03(F).

{¶12} Davis fails to fully develop any argument in this assignment of error. He merely concludes that the inconsistent jury verdicts are proof that the State produced insufficient evidence to support his convictions. According to Davis, the jury's finding of not guilty on the firearm specifications negate an element of aggravated robbery, which is the basis of both of his convictions.

{¶13} However, the State's theory presented at trial was that of complicity, and the jury was instructed on complicity. Under the theory of complicity, Davis did not have to possess a firearm. To be sufficient to sustain his conviction, the evidence need only show that he aided or abetted Carr and/or Williams in their commission of felony murder and aggravated robbery. *See Johnson* at syllabus; S*tephens* at ¶ 18.

{¶14} Williams, Carr, Davis, and several other people were at Davis' house on Princeton Street when Williams decided to rob Minter because he needed money. When Williams discussed the robbery with Davis and Carr, Davis told Williams "he was cool." According to Williams, Carr parked his mother's Buick Rendezvous in an alley behind Davis' house and gave the keys to Davis. The plan was for Williams and Carr to rob Minter, who was in a car parked down the street from Davis' house, return to the Buick Rendezvous, and have Davis drive them to Williams' aunt's house.

{¶15} According to Williams, he approached Minter who was sitting in the front passenger's seat of Anderson's car. As Williams approached Minter, Carr approached Anderson. Both Williams and Carr had their guns drawn. As Williams robbed Minter of $200, he heard Carr fire a shot. The car then began rolling, and Minter and Williams took off running. Williams ran up Princeton Street, through a field, and to the waiting Buick Rendezvous in the alley. Davis then drove him to his aunt's house. After Davis dropped Williams off, he went to find Carr. Davis and Carr then returned to Williams' aunt's house, where the three divided up the proceeds from the robbery.

{¶16} Viewing the evidence in a light most favorable to the prosecution, Williams' testimony provided sufficient evidence for a rational juror to have found that Davis "supported, assisted, * * * [or] cooperated with" Carr and Williams in their commission of aggravated robbery and felony murder. *See Johnson*, 93 Ohio St.3d at syllabus. *See also Jenks*, 61 Ohio St.3d at paragraph two of the syllabus.

**Manifest Weight of the Evidence**

{¶17} A conviction that is supported by sufficient evidence may still be found to be against the manifest weight of the evidence. *Thompkins*, 78 Ohio St.3d at 387; *Eastley v.*

*Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 12. "Weight of the evidence concerns 'the inclination of the *greater amount of credible evidence,* offered in a trial, to support one side of the issue rather than the other.'" (Emphasis sic.) *Thompkins* at 387, quoting *Black's* at 1594.

> In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the fact[-]finder's resolution of the conflicting testimony." *Thompkins* at 387, quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). An appellate court should exercise the power to reverse a judgment as against the manifest weight of the evidence only in exceptional cases. *Otten* at 340.

{¶18} Again, Davis fails to fully develop any argument in this assignment of error. In two short sentences, Davis asserts that his convictions are unsupported by the evidence because (1) the evidence against him is "scant," and (2) Williams' testimony is not credible.

{¶19} Williams testified that he was in front of Davis' house with a group of people when he developed a plan to rob Minter. He discussed the plan with Carr and Davis, and, according to Williams, Davis said "he was cool." Williams testified that the plan was for Williams and Carr to approach Minter, who was sitting in a car up the street, rob him, and then have Davis drive the three of them out of the area. As part of the plan, Carr parked his mother's Buick Rendezvous in the alley behind Davis' house and gave the keys to Davis.

{¶20} As Williams was robbing Minter, Carr shot Anderson. After the shot was fired, Williams said he took off running. He returned to the Buick and Davis drove him to his aunt's

house as planned. While in route, Williams called Carr to find out where he was. Davis then returned to the area, picked Carr up, and drove him to Williams' aunt's house. According to Williams, the three divided up the proceeds from the robbery and then went across town to Carr's mother's house. They helped Carr's mother move some things out of the basement and Davis left on foot. Williams testified that, later that evening, Carr's mother dropped him off on Crosier Street.

{¶21} In his first interview with the police, Williams denied any involvement in the incident. He later confessed to the police that he robbed Minter, but identified Davis as the shooter and Carr as the "getaway" driver. Williams explained that he lied because he thought Davis had turned him in. When he discovered that Davis' statement to the police had not implicated him, he corrected his statement. According to Williams, the version to which he testified at trial is an accurate account of what happened on January 10th. Williams explained to the jury that he had entered a plea deal. In exchange for his cooperation, Williams faced 6 to 14 years in prison for his involvement.

{¶22} Jazmen Davis, Davis' sister, testified that, on the afternoon of January 10, 2012, a group was gathered on the front porch of the house she shared with Davis. Williams, Davis, and Carr were included in this group. Jazmen overheard Williams discussing a plan to rob Minter. Jazmen first testified that neither Davis nor Carr responded to Williams' plan, but later explained that Davis told Williams that he did not want anything to do with the robbery. Shortly thereafter, according to Jazmen, Davis came inside the house and the rest of the group left. About five minutes later, she heard gunshots.

{¶23} Jazmen testified that she and Davis went outside for a brief minute, went back inside the house, and then Davis left. According to Jazmen, Davis left on foot and walked down

Princeton Street toward the location of the shooting. Davis returned to the house a few hours later and told Jazmen that he had gone over to his girlfriend's house across town. Jazmen testified that she did not see a car in the alley behind her house after the shooting.

{¶24} In her first interview with the police, Jazmen explained that she had given the detective a false name because she had an outstanding warrant. She told the detective that after the shots were fired she saw a man wearing all black running up Princeton Street, away from the scene of the shooting. She later told the police that, at the time of the shooting, Davis was in the house with her. However, she acknowledged that Davis left the house shortly after the shooting and she did not know where he went.

{¶25} Jesus Gallardo, Davis' neighbor, testified that right before the shooting he noticed a tan minivan in the alley behind his house. He explained that the car moved behind Davis' house as Gallardo was searching for tools in his garage. He then heard gunfire and ran out of his garage as the minivan was pulling away. Gallardo testified that he could not identify what brand of car it was and that he was not paying too much attention because it is not uncommon for cars to be in the alley behind his house.

{¶26} Shaunte Hill testified that she was sitting in a car on Princeton Street at the time of the shooting. She was parked in a driveway next to where Anderson was shot. She explained that when she saw two men approaching Anderson's car with guns, she drove off. Hill admits that she first told the police that Davis was the shooter. She explained that she was mad at Davis for telling the police that she was a witness. She did not want to be involved because she had a felony case of her own pending at the time. Hill testified that she later corrected her statement to the police. Hill said that she saw Davis about 30 minutes before the shooting when he approached her sitting in her car. They talked for a few minutes and Davis left. Anderson had

not yet arrived. Hill maintains that Davis was not at Anderson's car at the time of the shooting. However, she did not testify to being in the alley behind Davis' house after the shooting.

{¶27} Both Wells and Minter were in Anderson's car when two men approached with guns drawn. Both testified that Davis was not there at the time of the shooting. Neither of the men testified to being in the alley behind Davis' house after the shooting. Wells agreed that the "word on the street" was that Davis was the "getaway" driver and that he was driving a Blue Geo Tracker. Wells testified that he saw Davis, Williams, and Carr in a Tracker later that evening, but did not see Davis or the Tracker at the time of the shooting.

{¶28} Felicia Lundy was at her sister's house on Princeton Street at the time of the shooting. Lundy testified that she was inside the house when she heard shots fired. She and two of her friends went down the street to Anderson's car. As they were heading down the street, she passed a man walking the other way. When they returned to her sister's house a few minutes later, she saw a man exit his house and get into the passenger's seat of a car driven by a woman. Lundy testified that she helped the car back out of the driveway about the same time the police arrived. Lundy testified that she was not able to identify the man that got into the car until she saw Davis' picture on the news.

{¶29} Lundy admitted that she did not contact the police when she recognized Davis' photograph. The police set up a meeting with Lundy to follow up, but when they arrived at her house she was not home. Lundy testified that she did not want to cooperate with the police because she was concerned about her family's safety.

{¶30} Sarina Lawrence, Carr's mother, also testified. According to Lawrence, Carr never drove her Buick Rendezvous. She explained that on January 10, 2012, she was home from 3 p.m. until about 11:45 p.m. when she left for work. Her car did not leave her house during that

time. Lawrence said she does not know Williams or Davis and neither of the men were at her house on January 10. She was unsure how Williams knew that she drove a Buick Rendezvous, but speculated that he could have found out because he has a child with the daughter of one of Lawrence's friends. Further, according to Lawrence, Williams' story does not make sense because he testified that she drove him to Crosier Street that night, but she lives on Crosier Street. It is unclear from Williams' testimony where on Crosier Street he claims to have been dropped off.

{¶31} Davis argues that his convictions are against the manifest weight of the evidence because Williams is not a credible witness. Presumably, Davis is arguing that Williams is not credible because he received a benefit for his testimony against Davis and Carr. However, the jury was fully informed of his plea deal. Credibility determinations are primarily for the trier of fact. *State v. Browning*, 9th Dist. Summit No. 26687, 2013-Ohio-2787, ¶ 18, citing *State v. Wingate*, 9th Dist. Summit No. 26433, 2013-Ohio-2079, ¶ 18.

{¶32} Williams testified that Davis was present when the plan was formed, provided rides out of the area to both Williams and Carr, and received some of the proceeds from the robbery. Contrary to Williams' version of events, Lundy testified that she saw Davis get into the passenger's seat of a car and leave the area about the same time the police arrived. However, Lundy also testified that she did not recognize Davis until ten days later when she saw his picture on the news. Lundy further testified that she did not want to cooperate with the police because she feared for the safety of her family.

{¶33} After reviewing the record, we cannot conclude that this is the exceptional case where the evidence weighs heavily against the convictions. *See Otten*, 33 Ohio App.3d at 340.

Davis' convictions are not against the manifest weight of the evidence. Therefore, his third assignment of error is overruled.

### Assignment of Error Number One

ALTHOUGH THE JURY FOUND THE APPELLANT GUILTY OF AGGRAVATED ROBBERY PER 2903.11(A)(1), BECAUSE SAID JURY FOUND THAT THE APPELLANT DID NOT HAVE A FIREARM ON OR ABOUT HIS PERSON OR UNDER HIS CONTROL, AND DID NOT EITHER DISPLAY, BRANDISH, INDICATE THAT HE POSSESSION A FIREARM OR DID NOT USE IT TO FACILITATE SAID AGGRAVATED ROBBERY, THE FINDING OF GUILT WAS ERRONIOUS DUE TO AN INCONSISTENT VERDICT FORM. BECAUSE NO OBJECTION WAS MADE BY TRIAL COUNSEL AND THE FAILURE TO RECOGNIZE AND TO OBJECT TO INCONSISTENT VERDICT FORM AND CONVICTIONS AFFECTS THE APPELLANT'S SUBSTANTIAL RIGHTS, PLAIN ERROR SHOULD APPLY. (Sic.)

### Assignment of Error Number Two

BECAUSE THE APPELLANT WAS IMPROPERLY FOUND GUILTY OF AGGRAVATED ROBBERY AS INDICATED IN ASSIGNMENT OF ERROR TWO, THIS COURT MUST TOO REVERSE HIS CONVICTION OF FELONY MURDER BECAUSE IN ORDER FOR THE APPELLANT TO BE FOUND GUILTY OF FELONY MURDER, HIS CONVICTION OF AGGRAVATED ROBBERY, THE UNDERLYING PREDICATE OFFENSE, MUST STAND.

**{¶34}** In his first two assignments of error, Davis argues that his convictions for felony murder and aggravated robbery must be reversed because the jury found him not guilty of the attendant firearm specifications. Specifically, Davis argues that the jury produced inconsistent verdicts when it found him guilty of the two offenses, but acquitted him of the associated firearm specifications. We disagree.

**{¶35}** Ohio courts have concluded that an acquittal of a specification "will not undermine the guilty finding on the principal charge where the guilty finding on the principal charge is supported by the evidence." *State v. Dearmitt*, 9th Dist. Wayne No. 96CA0021, 1997 WL 33290, *3 (Jan. 15, 1997), citing *State v. Burton*, 6th Dist. Sandusky Nos. S-95-008 &

94CR701, 1996 WL 139531, *5 (Mar. 8, 1996). *Accord State v. Robinson*, 8th Dist. Cuyahoga No. 99290, 2013-Ohio-4375, ¶ 102, quoting *State v. Glenn*, 1st Dist. Hamilton No. 090205, 2011-Ohio-829, ¶ 70 ("[A] jury's general finding of guilty is not invalid where, * * * there is a conviction on the principal charge * * * and an acquittal on the accompanying firearm specifications.").

{¶36} As discussed above, Davis' convictions for felony murder and aggravated robbery are supported by the evidence. His acquittals on the firearm specifications do not undermine his convictions for the principal offenses. *See Dearmitt* at *3. Davis' first and second assignments of error are without merit and are overruled.

Assignment of Error Number Four

THE APPELLANT'S TRIAL COUNSEL WAS INEFFECTIVE BECAUSE SAID COUNSEL DID NOT FILE A MOTION TO SEVER THE APPELLANT'S TRIAL FROM THE CO-DEFENDANT'S TRIAL PER CRIM.R. 14, AND FAILING TO OFFER A CONTINUING MOTION FOR SEVERANCE DUE THE (sic) PREJUDICE THAT IT INVOKED UP (sic) THE APPELLANT WHO SHOULD HAVE HAD HIS CASE TRIED SEPARATELY FROM THE CO-DEFENDANT. SAID ERROR IS PLAIN ERROR AND REQUIRES REVERSAL.

{¶37} In his fourth assignment of error, Davis argues that his counsel was ineffective for failing to file a motion to sever his trial from his co-defendant, Carr.

{¶38} To prove ineffective assistance of counsel, Davis must establish that (1) his counsel's performance was deficient, and (2) that but for counsel's deficient performance there is a reasonable probability that the result of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). This Court need not address both *Strickland* prongs if an appellant fails to prove either one. *State v. Jones*, 9th Dist. Summit No. 26226, 2012-Ohio-2744, ¶ 16.

**{¶39}** Crim.R. 8(B) provides that "[t]wo or more defendants may be charged in the same indictment * * * if they are alleged to have participated in the same * * * course of criminal conduct." Further, the co-defendants may be tried together "if the offenses or the defendants could have been joined in a single indictment." Crim.R. 13. "The law favors joinder." *State v. Patel*, 9th Dist. Summit No. 24024, 2008-Ohio-4692, ¶ 51.

**{¶40}** If a defendant will be prejudiced by a joint trial with a co-defendant, he or she may seek a separate trial. *See* Crim.R. 14. "A defendant who asserts that joinder is improper has the burden of making an affirmative showing that his rights will be prejudiced thereby." *State v. Roberts*, 62 Ohio St.2d 170, 175 (1980).

**{¶41}** Davis asserts that he was prejudiced by a joint trial because the evidence against Carr was "insurmountable." However, Davis fails to explain how the evidence against Carr was prejudicial to him. By all accounts, Carr and Davis played separate and distinct roles in the incident. Many of the witnesses testified that Carr shot Anderson; however, none of the witnesses saw Davis at Anderson's car. The only testimony implicating Davis was Williams' testimony that he was the "getaway" driver. Because Davis has not articulated any basis for a motion to sever, we cannot conclude that he was prejudiced by his counsel's failure to file such a motion. As Davis has not establish prejudice, his claim of ineffective assistance must fail. Davis' fourth assignment of error is overruled.

## III

**{¶42}** Davis' assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

BETH WHITMORE
FOR THE COURT

MOORE, P. J.
BELFANCE, J.
CONCUR.


APPEARANCES:

JANA DELOACH, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.