[Cite as *State v. Lopez-Olmedo*, 2022-Ohio-2817.]

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | |

| | |
|---|---|
| STATE OF OHIO | C.A. No. 21CA011745 |
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| CARLOS RAUL LOPEZ-OLMEDO | COURT OF COMMON PLEAS COUNTY OF LORAIN, OHIO |
| Appellant | CASE No. 18CR099742 |

DECISION AND JOURNAL ENTRY

Dated: August 15, 2022

CALLAHAN, Judge.

{¶1}  Appellant, Carlos Raul Lopez-Olmedo, appeals from the judgment of the Lorain County Court of Common Pleas.  For the reasons set forth below, this Court affirms.

I.

{¶2}  On November 12, 2018, law enforcement officers from local police departments and state and federal agencies executed a search warrant for the house, vehicles, and persons located at 1680 East 31st Street in Lorain, Ohio in connection with an investigation regarding the sale of drugs at that location.  Inside the house officers found a box of gallon-sized plastic freezer bags, a silver drug press, a digital scale, a blender, three bars of mannite, and a digital video recorder.  Testing of a swab for residue on the digital scale revealed the presence of heroin and fentanyl.

{¶3}  As part of the execution of the search warrant, law enforcement officers detained Mr. Lopez-Olmedo at the side door of the house and searched him.  As he was being detained, a

small amount of cash fell out of Mr. Lopez-Olmedo's pocket. The search of Mr. Lopez-Olmedo uncovered two bars of mannite and a baggie containing a substance believed to be contraband. Laboratory testing determined that the substance was 188.16 grams of heroin and 6-Monoacetylmorphine.

{¶4} Mr. Lopez-Olmedo was indicted and pleaded not guilty to two counts of trafficking in drugs, one count of possessing drugs with accompanying forfeiture and major drug offender specifications, and one count of drug paraphernalia. Prior to trial, the State dismissed one of the trafficking in drugs counts, the drug paraphernalia count, and the forfeiture specifications. A jury found Mr. Lopez-Olmedo guilty of trafficking in drugs in violation of R.C. 2925.03(A)(2)/(C)(6)(g) and possession of drugs in violation of R.C. 2925.11(A)/(C)(6)(f), and that the weight of the heroin constituted a major drug offender violation as to both charges. The trial court merged the counts for purposes of sentencing and sentenced Mr. Lopez-Olmedo to a mandatory term of eleven years in prison for trafficking in drugs.

{¶5} Mr. Lopez-Olmedo appeals his conviction raising three assignments of error for this Court's review.

II.

**ASSIGNMENT OF ERROR NO. 1**

THE TRIAL COURT ERRED IN FAILING TO CONTINUE THE TRIAL WHERE MR. LOPEZ-OLMEDO NEEDED AN INTERPRET[E]R IN ORDER TO UNDERSTAND THE PROCEEDINGS AND WHERE HE COULD NOT HEAR THE INTERPRET[E]R DUE TO COVID-19 ISSUES NECESSITATING THE COURT REPORTER TO BE PRESENT BY ZOOM.

{¶6} In his first assignment of error, Mr. Lopez-Olmedo maintains that the trial court erred in proceeding with the jury trial when he was unable to hear the Spanish interpreters and understand the proceedings, and thereby depriving him of his right to due process.

{¶7}    At the beginning of the jury trial, Mr. Lopez-Olmedo notified the trial court that he was unable to hear the Spanish interpreters.  The trial court proceeded with the trial despite Mr. Lopez-Olmedo's assertion that he was unable to hear the interpreters.  Mr. Lopez-Olmedo did not object or in any other way notify the court that the problem with the volume persisted and that he was unable to hear the interpreters and understand the proceedings throughout the entirety of the trial.  Accordingly, he has forfeited all but plain error.  We, therefore, review Mr. Lopez-Olmedo's arguments under a plain-error standard.  *See generally* Crim.R. 52(B).

{¶8}    Pursuant to Crim.R. 52(B), despite the absence of an objection in the trial court, this Court may notice plain errors or defects affecting a substantial right.  Plain error exists only when there has been a deviation from a legal rule that constitutes an obvious defect in the trial proceedings that affected the outcome of the trial.  *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002).  This Court's decision to correct plain error is discretionary and should only be done in exceptional circumstances to prevent a manifest miscarriage of justice.  *Id*., quoting *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

{¶9}    "In Ohio, R.C. 2311.14 establishes the right to a court-appointed interpreter and case law has confirmed that right."  *State v. Razo*, 157 Ohio App.3d 578, 2004-Ohio-3405, ¶ 21 (9th Dist.) (Carr, J., concurring in judgment only), citing R.C. 2311.14 and *State v. Pina*, 49 Ohio App.2d 394 (2d Dist.1975).  R.C. 2311.14(A) provides that a qualified interpreter shall be appointed to assist in legal proceedings where a party or witness is unable to communicate or understand due to an impairment, such as speaking a language other than English.  Additionally, Sup.R. 88 provides guidance to the courts regarding when to appoint a foreign language interpreter in a case: a foreign language interpreter shall be appointed by the court for a party or witness with limited English proficiency or who is non-English speaking when the court determines, either by

motion or sua sponte, that the "services of the interpreter are necessary for the meaningful participation of the party or witness." Sup.R. 88(A)(1). The failure to appoint an interpreter for a non-English speaking or limited-English proficient criminal defendant compromises the defendant's right to due process. *Columbus v. Lopez-Antonio*, 153 Ohio Misc.2d 4, 2009-Ohio-4892, ¶ 3 (M.C.).

{¶10} It is well established that a defendant in a criminal case "is entitled to hear the proceedings in a language he can understand." *Pina* at 399. *Accord State v. Bravo*, 9th Dist. Summit No. 27881, 2017-Ohio-272, ¶ 34. While the trial court has discretion on how this is accomplished, it nonetheless "must be accomplished." *Pina* at 399. An abuse of discretion is present when a trial court's decision "'is contrary to law, unreasonable, not supported by evidence, or grossly unsound.'" *Menke v. Menke*, 9th Dist. Summit No. 27330, 2015-Ohio-2507, ¶ 8, quoting *Tretola v. Tretola*, 3d Dist. Logan No. 8-14-24, 2015-Ohio-1999, ¶ 25.

{¶11} In this matter, the trial court swore-in two Spanish interpreters for Mr. Lopez-Olmedo. After the court addressed matters related to amending the indictment, the interpreter notified the trial judge that Mr. Lopez-Olmedo was unable to hear the interpreter:

| The Interpreter: | Your Honor, just because he cannot hear really good, I guess he's listening to both -- |
| --- | --- |
| The Court: | What do you need us to do? What does he need us to do? |
| The Interpreter: | Okay. I guess the volume from -- the volume from the microphone, it's interfering because he hears the English version and he also hears the Spanish version, and he said he can't hear. So he's not really catching -- |
| The Court: | Well, we have to amplify the English part of this to have the court reporter pick it up in the other room.<br><br>So what would you suggest we do? |

| | |
|---|---|
| The Interpreter: | Let me consult with the other interpreter to see if there's anything we can do. |

(Unintelligible.)

| | |
|---|---|
| The Deputy: | Your Honor? |
| The Court: | Yeah. |
| The Deputy: | Between my broken Spanish and his broken English, I've had numerous conversations with the defendant -- (Unintelligible.) |

* * *

| | |
|---|---|
| The Deputy: | This is Deputy Rico. He just wants to continue in English and have an interpreter stand by in case he doesn't understand something. |
| [Mr. Lopez-Olmedo]: | I do want to go forward. |
| The Interpreter: | I'm just going to interpret what he's saying. He prefers to listen to the interpreter so that he can understand everything. His voice and her voice are commingling, so he cannot hear. |
| [Mr. Lopez-Olmedo]: | All you hear is -- |

(Unintelligible noise.)

| | |
|---|---|
| The Court: | And it's only from that microphone? |
| [Mr. Lopez-Olmedo]: | When he was talking, they go right with hers, both voices, together. |
| The Court: | Let's continue now as best we can and if there's a problem, you let us know. We want you, of course, to be able to hear everything. |

{¶12}  Based upon the above exchange, the trial court was made aware of a problem with the volume of the microphone interfering with Mr. Lopez-Olmedo's ability to hear the Spanish interpreters.  While the trial court explained that the volume needed to be turned up for the court reporter to be able to hear for transcription purposes, the trial court did not attempt to adjust the

volume of the microphone, relocate the court reporter, or explore any other options to resolve the problem. Rather, the trial court placed the burden on the interpreters to find a solution. While the interpreters discussed the matter, the deputy interjected, claiming that Mr. Lopez-Olmedo wanted to continue in English and have the interpreters on standby. Similarly, the interpreters suggested that they only interpret what Mr. Lopez-Olmedo said.

{¶13} Only a party, and not his counsel or the court, may waive the right to an interpreter. *State v. Nasser*, 10th Dist. Franklin No. 02AP 1112, 2003-Ohio-5947, ¶ 25, citing *United State v. Osuna*, 189 F.3d 1289, 1292 (10th Cir.1999). *See generally* Sup.R. 88(H). Based upon the transcript, Mr. Lopez-Olmedo did not waive the use of an interpreter at trial. Mr. Lopez-Olmedo's statement to the trial court was "I do want to go forward." He did not make any further statements that he did not need the interpreters or that he only needed the interpreters on standby for when he did not understand something. *Compare Nasser* at ¶ 26. Additionally, neither the deputy nor the interpreters could have waived Mr. Lopez-Olmedo's right to an interpreter. *See id.* at ¶ 25. Furthermore, the record does not reflect that the trial court treated or accepted the exchange between the deputy, Mr. Lopez-Olmedo, and the interpreters as a waiver by Mr. Lopez-Olmedo of his right to an interpreter. Nor does the record indicate that the trial court permitted the interpreters to only interpret what Mr. Lopez-Olmedo said.[1]

{¶14} In the absence of a viable solution from the interpreters and making no further attempts to resolve the problem, the trial court decided to continue with the trial "as best we can" and instructed the interpreters and the defense to notify the court "if there's a problem" because

---

[1] The transcript shows that the interpreters were present each day of the trial and continued interpreting the proceedings for Mr. Lopez-Olmedo. For instance, on the first day of trial the interpreter asked to have the plea terms repeated and during the second day of trial the State requested a witness to slow down while speaking because there was an interpreter.

the court wanted Mr. Lopez-Olmedo "to be able to hear everything." Although the trial court acknowledged the problem with the volume of the English version and the need for Mr. Lopez-Olmedo to hear the proceedings, it abused its discretion when it did not attempt to resolve Mr. Lopez-Olmedo's inability to hear the Spanish translation and continued with the trial.

{¶15} Although the trial court should have taken steps to insure that Mr. Lopez-Olmedo was able to hear the Spanish interpreters before proceeding with the trial, we cannot say that the trial court's failure constituted plain error in this case. Mr. Lopez-Olmedo claims that he was unable to understand the proceedings and was deprived of his right to due process. The record, however, does not support his claim.

{¶16} Following the discussion regarding Mr. Lopez-Olmedo's ability to hear the interpreters, the trial court addressed Mr. Lopez-Olmedo regarding his decision as to the plea offer. Defense counsel indicated to the court that he had explained to Mr. Lopez-Olmedo the State's offer of nine years and his eligibility for judicial release and that the offer would be rejected. When the court inquired of Mr. Lopez-Olmedo, the interpreter asked to have it repeated. Defense counsel repeated the terms and then engaged in a discussion with Mr. Lopez-Olmedo. Next, the court advised Mr. Lopez-Olmedo of the mandatory sentence of eleven years if he was found guilty, set forth the terms of the State's offer, and explained judicial release. Mr. Lopez-Olmedo, speaking in Spanish, interrupted the court during its explanation of the foregoing. The court stopped Mr. Lopez-Olmedo, instructing him to let the court finish explaining these points. Once it finished explaining the penalties, the court asked Mr. Lopez-Olmedo if he understood, to which Mr. Lopez-Olmedo directly responded in English "Yes[]" and the following exchange occurred:

The Court: All right. And you still want to go forward here?

[Mr. Lopez-Olmedo]: Yes, because the first offer was for eight and they're not counting all the time that I already was incarcerated.

The Court: Yes, the time that you've been incarcerated counts. So it would be seven years -- essentially seven years left on your sentence. You've got two in, right?

[Defense counsel]?

[Defense counsel]: Yes, he does.

The Court: So you get credit for that.

[Mr. Lopez-Olmedo]: For the first time, they said I was going to be -- coming out in five years, but they're not counting that.

The Court: No.

[Mr. Lopez-Olmedo]: Yes, let's go with the trial.

{¶17} A second exchange occurred between the court and Mr. Lopez-Olmedo after the verdict was read and prior to the court sentencing him.

The Court: Okay. Mr. Lopez-Olmedo, is there anything you want to say before I sentence you, sir?

* * *

[Mr. Lopez-Olmedo]: I don't have enough to pay for it -- (unintelligible.)

[Defense counsel]: He would like to appeal. That's all.

The Court: That's his right.

It is your right to have an appeal, and I will assign counsel for you. Okay.

[Mr. Lopez-Olmedo]: I want to appeal because it's a lot of stuff that they don't bring. One informant walked with that bag to the house, and they go -- (unintelligible) -- and it was not fair. And I've been saying -- (unintelligible) -- I want to believe that, but everything, they haven't -- (unintelligible.) One of the informants, they bring the stuff, bring it out and count it. They don't play that in here, you know what I mean?

| | |
|---|---|
| The Court: | Okay. The appeal will take place and it will not be a part of this Court. It will be another court that will handle the appeal, three charges. |
| [Mr. Lopez-Olmedo]: | I asked for the impurity of the drugs. They never did that. |
| [Defense counsel]: | He said "impurity["]. |
| [Mr. Lopez-Olmedo]: | They didn't do that. I asked for the impurity of the drugs. They didn't do that. It's the whole thing, that they blow it up. I didn't do this. They didn't bring it -- (unintelligible.) |

After he was sentenced, Mr. Lopez-Olmedo responded to the court's questions regarding his finances relative to the appointment of appellate counsel.

{¶18} In both of these instances, the transcript reflects that the interpreters did not translate Mr. Lopez-Olmedo's responses to the court, but rather Mr. Lopez-Olmedo engaged in a dialogue with the judge and responded appropriately to the judge's questions in English. *See, e.g., In the Matter of M.A.*, 10th Dist. Franklin No. 20AP-345, 2021-Ohio-1078, ¶ 25, 31. The fact that Mr. Lopez-Olmedo was able to provide appropriate responses to the court's inquiries despite his assertion on appeal that he was unable to hear the Spanish interpreter supports a finding that he understood the proceedings.

{¶19} Further, Mr. Lopez-Olmedo did not simply answer "yes" or "no" to the questions asked by the court. Rather, he also explained his bases for an appeal and his reason for declining the plea offer by referencing prior plea offers and jail time credit. In doing so, Mr. Lopez-Olmedo demonstrated his command of English and familiarity with legal terms. *See, e.g., In re Marriage of Beynenson*, 11th Dist. Geauga No. 2012-G-3066, 2013-Ohio-341, ¶ 28. Moreover, Mr. Lopez-Olmedo's explanation to the court as to what he perceived to be deficiencies in the evidence and

issues presented at trial that he wanted to raise in an appeal does not support his assertion that he was unable to understand the evidence and testimony presented during the trial.

{¶20} Notably, during the entirety of the three-day trial, Mr. Lopez-Olmedo spoke through the interpreters on only two occasions: first, when the interpreters advised the court that Mr. Lopez-Olmedo was unable to hear them, and second, when the interpreters asked that the plea offer be repeated. *See, e.g., State v. Resendiz*, 12th Dist. Preble No. CA2009-04-012, 2009-Ohio-6177, ¶ 21. In both instances, Mr. Lopez-Olmedo also participated in the dialogue by speaking directly to the court in English. Finally, neither Mr. Lopez-Olmedo nor the interpreters raised any additional concerns during the remainder of the three-day trial that he was unable to hear the interpreters and understand the proceedings. *See, e.g., id*.

{¶21} Based upon the foregoing, the transcript in this matter does not support Mr. Lopez-Olmedo's assertion that he was unable to understand the proceedings and that the outcome of the trial would clearly have been different but for the trial court's error. Therefore, no plain error existed, and Mr. Lopez-Olmedo was not deprived of due process.

{¶22} Mr. Lopez-Olmedo's first assignment of error is overruled.

## ASSIGNMENT OF ERROR NO. 2

THE VERDICT IN THIS CASE IS AGAINST THE SUFFICIENCY OF THE EVIDENCE AND SHOULD BE REVERSED BECAUSE IT VIOLATES THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE I, SECTION 10 OF THE CONSTITUTION OF THE STATE OF OHIO.

{¶23} In his second assignment of error, Mr. Lopez-Olmedo argues that his convictions for trafficking in drugs are based on insufficient evidence.[2] This Court disagrees.

---

[2] Mr. Lopez-Olmedo states in his brief that he was convicted of trafficking in drugs in violation of R.C. 2925.03(A)(1) and (A)(2) and presents arguments regarding the sufficiency of the evidence for both of these convictions. While Mr. Lopez-Olmedo was charged with both

{¶24} "Whether a conviction is supported by sufficient evidence is a question of law that this Court reviews de novo." *State v. Williams*, 9th Dist. Summit No. 24731, 2009-Ohio-6955, ¶ 18, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). The relevant inquiry is whether the prosecution has met its burden of production by presenting sufficient evidence to sustain a conviction. *Thompkins* at 390 (Cook, J., concurring). For purposes of a sufficiency analysis, this Court must view the evidence in the light most favorable to the State. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We do not evaluate credibility, and we make all reasonable inferences in favor of the State. *State v. Jenks*, 61 Ohio St.3d 259, 273 (1991). The evidence is sufficient if it allows the trier of fact to reasonably conclude that the essential elements of the crime were proven beyond a reasonable doubt. *Id*. The trier of fact is entitled to rely on direct, as well as circumstantial evidence. *See id*.

{¶25} Mr. Lopez was convicted of trafficking in drugs in violation of R.C. 2925.03(A)(2). R.C. 2925.03(A)(2) provides that "[n]o person shall knowingly * * * [p]repare for shipment, ship, transport, deliver, prepare for distribution, or distribute a controlled substance * * *, when the offender knows or has reasonable cause to believe that the controlled substance * * * is intended for sale or resale by the offender or another person." Mr. Lopez-Olmedo asserts that the State did not prove that he prepared a controlled substance for shipping or distribution.

{¶26} Detective Christian Franco of the Lorain Police Department Narcotics Unit testified that on November 12, 2018, he prepared and obtained a search warrant for the house, vehicles, and persons located at 1680 East 31st Street in Lorain, Ohio. Detective Franco described the house as being divided into three levels with apartments: Melvin Garcia resided on the first floor, someone

---

counts of trafficking in drugs, he was only convicted of trafficking in drugs in violation of R.C. 2925.03(A)(2). The State dismissed the other count of trafficking in drugs brought under R.C. 2925.03(A)(1) prior to the commencement of the trial. We will limit our review accordingly.

lived on the second floor, and the third floor attic had a mattress. He had no knowledge of Mr. Lopez-Olmedo having an ownership interest in the house.

{¶27} Detective Howard Heathcoat, also from the Lorain Police Department Narcotics Unit, described the house as having three different levels which consisted of an up and down duplex with an attic space that was also used as a living space. During the execution of the search warrant, Detective Heathcoat took photographs of the inside and outside of the house and the items found inside the house. Detective Heathcoat's photographs admitted as exhibits included a sign in the window on the front of the house indicating a security camera is in use; in the bedroom on the first floor, a DVR box and computer screen with real time video footage of the outside of the house; a camera connected to the DVR; the back of the house; different views of the stairs leading to the second and third floors; money, two bars of mannite, and a substance in a plastic bag sitting on the bottom step outside of the house; a lid with bars of mannite and a white powder on the kitchen floor on the first floor; and a box of baggies, a hand press, a digital scale, and blender in the attic. Detective Heathcoat testified that based upon his prior investigations conducted by the narcotics unit, he has seen digital scales, baggies, blenders, hand presses, and mannite used in manufacturing a product to sell. He testified that mannite is used "as a cut for heroin, cocaine, drugs, in general, to stretch out your drug." He explained in drug trafficking that "[t]he mannite is mixed with the heroin to -- and then obviously the scale to weigh it out to figure out how much you want. They usually do that to stretch out their drugs to make more money."

{¶28} Detective Todd Straub of the Elyria Police Department Narcotics Unit was called by the Lorain Police Department to assist with the search of the attic of the house on November 12, 2018. Detective Straub testified that the box of baggies, digital scale, blender, and drug press that were admitted as exhibits at trial were the same items that he found when searching the attic

and as depicted in the photographs taken by Detective Heathcoat. Detective Straub further testified that he had seen these items "[q]uite often[]" in prior investigations of drug trafficking and explained how these items are used in drug trafficking:

> Obviously the scale is used to, you know, weigh out the drugs during or prior to packaging. The bags are obviously used for packaging. The blender, typically if they have raw or pure, whether it's heroin, fentanyl, cocaine, a lot of times they'll add to the product. They'll use other cutting agents, such as lactose, Mannitol, other agents. They'll mix it up in the blender to basically create more product, and then hand presses like this are usually after they're powered down in the blender, then they'll compact it in a hand press like that.

Detective Straub indicated that Mannitol is also referred to as mannite and is used in drug trafficking.

{¶29} Sergeant Dennis Camarillo of the Lorain Police Department Narcotics Unit testified that he, Detective Heathcoat, and Special Agent White met with a confidential informant who placed a controlled phone call to Melvin Garcia on November 12, 2018. After the phone call, the confidential informant went to 1680 East 31st Street in Lorain, where the informant met with Mr. Lopez-Olmedo at approximately 3:00 p.m. This meeting was captured on video by the DVR found in the first floor bedroom. Using the video footage in State's Exhibit 1, Sergeant Camarillo pointed to the confidential informant arriving at the house and Mr. Lopez-Olmedo appearing from the back southwest corner of the house, walking across the backyard, and turning the corner to where the confidential informant was on the northeast side of the house. The video then shows the confidential informant and Mr. Lopez-Olmedo hug, walk toward the back of the house and across the backyard, enter the door on the southwest corner, go up the stairs to the second floor, go down the hallway, and turn into the stairwell leading to the third floor attic. Sergeant Camarillo indicated the confidential informant was inside the house approximately thirty minutes. Based on this information, a search warrant was obtained.

{¶30} Next Sergeant Camarillo testified regarding State's Exhibit 2, which was a DVD containing videos downloaded from the DVR found inside the house pertaining to the execution of the search warrant on November 12, 2018 at 6:00 p.m. This video depicts Mr. Lopez-Olmedo being detained by SWAT and searched by Special Agent William Meholif. Sergeant Camarillo identified Mr. Lopez-Olmedo as the second person who exited the side door of the house. The video shows that, as SWAT pulled Mr. Lopez-Olmedo off the steps and onto the ground, multiple items fell out of his pockets. Sergeant Camarillo indicated that he was present when Special Agent Meholif found two packages of mannite and 188 grams of heroin on Mr. Lopez-Olmedo. Sergeant Camarillo testified that mannite is a cutting agent and that the street value of "188 grams [of heroin] at $80 a gram would be just over $15,000[.]"

{¶31} Special Agent Meholif from the Drug Enforcement Administration was called to assist with the search warrant on November 12, 2018, by securing and searching persons outside the house. Prior to searching Mr. Lopez-Olmedo, Special Agent Meholif testified that he picked up a small amount of loose money on the ground that was believed to have come from Mr. Lopez-Olmedo and placed it near him. The video then shows Special Agent Meholif searching Mr. Lopez-Olmedo. Special Agent Meholif testified that the first thing he found on Mr. Lopez-Olmedo were two bars of mannite with the marking "'Mannite Cicogna.'" Next, Special Agent Meholif stated that he found State's Exhibit 49, a white substance in a plastic bag, rolled up in the front waistband of Mr. Lopez-Olmedo's shorts.

{¶32} Elizabeth Doyle, a forensic drug analyst at the Lorain County Crime and Drug Lab, testified that she received from the Lorain Police Department State's Exhibit 45, a digital scale, and State's Exhibit 49, a plastic baggie containing a white substance, for analysis. Forensic Drug Analyst Doyle explained that she weighed and tested a sample of the white substance in the baggie

and concluded that the white substance in State's Exhibit 49 was heroin and 6-Monoacetylomorphine, both schedule I controlled substances, and it weighed 188.16 grams. She also tested and analyzed a sample of residue from the digital scale. Based upon the testing, Forensic Drug Analyst Doyle opined that the residue on the digital scale was heroin and fentanyl.

{¶33} Drug trafficking may be proven by circumstantial evidence. *State v. Delaney*, 9th Dist. Summit No. 28663, 2018-Ohio-727, ¶ 11, quoting *State v. Washington*, 6th Dist. Ottawa No. OT-12-032, 2014-Ohio-1008, ¶ 36. This Court and our sister courts have "'held that the convergence of illegal drugs, drug paraphernalia (including baggies), and large sums of cash permit a reasonable inference that a person was preparing drugs for shipment.'" *Delaney* at ¶ 11, quoting *State v. Fry*, 9th Dist. Summit No. 23211, 2007-Ohio-3240, ¶ 50 and *State v. Rutledge*, 6th Dist. Lucas No. L-12-1043, 2013-Ohio-1482, ¶ 15 ("collecting cases and stating that 'numerous courts have determined that items such as plastic baggies, digital scales, and large sums of money are often used in drug trafficking and may constitute circumstantial evidence * * *.'"). Large amounts of drugs and the street value of the drugs are also circumstantial evidence of drug trafficking. *See State v. Townsend*, 8th Dist. Cuyahoga No. 107177, 2019-Ohio-544, ¶ 16-17.

{¶34} In this case, there was circumstantial evidence that Mr. Lopez-Olmedo prepared a controlled substance for shipping or distribution. The State presented evidence that, during the search of Mr. Lopez-Olmedo, Special Agent Meholif found a baggie containing a white substance and two bars of mannite on his person. Forensic Drug Analysist Doyle confirmed through laboratory testing that the white substance found on Mr. Lopez-Olmedo was 188.16 grams of heroin and 6-Monoacetylomorphine, which are schedule I controlled substances. Sergeant Camarillo testified regarding the street value of 188 grams of heroin and that mannite is a cutting

agent. Detective Straub and Detective Heathcoat also identified mannite as a cutting agent and testified how it is used in drug trafficking.

{¶35} There was also testimony from Detective Straub that he found a box of gallon-sized Ziploc freezer baggies, a digital scale, a blender, and a drug press in the attic, that he has seen these items "[q]uite often[]" in prior drug trafficking investigations, and explained how each is used in drug trafficking. Similarly, Detective Heathcoat, who photographed these items in the attic, testified that they are used in manufacturing a product to sell and explained how mannite and a digital scale are used in drug trafficking.

{¶36} Mr. Lopez-Olmedo, however, claims that the State's evidence of the digital scale, baggies, drug press, and blender is insufficient to support his conviction for trafficking in drugs because those items could not be attributed to him. Mr. Lopez specifically points out that there were no fingerprints or DNA taken from those items and there were seventeen other persons in the house when the search warrant was executed. Although there was no direct evidence attributing the items found in the attic to Mr. Lopez-Olmedo, there was circumstantial evidence attributing those items to him and circumstantial evidence has the same probative value as direct evidence. *Jenks*, 61 Ohio St.3d 259 at paragraph one of the syllabus.

{¶37} To this end, Sergeant Camarillo testified and the video footage showed that three hours prior to the execution of the search warrant the confidential informant and Mr. Lopez-Olmedo entered the stairwell that ends at the third floor attic. Additionally, Sergeant Camarillo testified that the confidential informant met with Mr. Lopez-Olmedo for approximately thirty minutes. Based on the video footage and Sergeant Camarillo's testimony, it is reasonable to infer that the confidential informant and Mr. Lopez-Olmedo entered the attic room where the box of baggies, drug press, digital scale, and blender were found by Detective Straub. Furthermore,

relying upon the inference that Mr. Lopez-Olmedo was in the attic, in conjunction with Detectives Straub and Heathcoat's testimony that those items were found in the attic and how those items and mannite are used in drug trafficking, Special Agent Meholif's testimony that he found two bars of mannite and a white substance in a baggie on Mr. Lopez-Olmedo, and Forensic Drug Analysist Doyle's testimony that the residue on the digital scale was heroin and fentanyl and the white substance found on Mr. Lopez-Olmedo was 188.16 grams of heroin and 6-Monoacetylmorphine, it is reasonable to make a parallel inference that Mr. Lopez-Olmedo was connected to the digital scale, blender, drug press, and baggies.

{¶38} Even assuming arguendo that there was no circumstantial evidence attributing the digital scale, blender, drug press, and baggies to Mr. Lopez-Olmedo, there was other circumstantial evidence that was sufficient to prove that he prepared a controlled substance for shipment or distribution: the 188.16 grams of heroin valued at over $15,000 and the two bars of mannite found on Mr. Lopez-Olmedo and the testimony of three law enforcement officers that mannite is used in drug trafficking as a cutting agent to stretch out drugs to make more money. *See State v. Heald*, 5th Dist. Richland No. 17CA50, 2018-Ohio-1789, ¶ 30-31 (relying on evidence of a large amount of heroin and the street value of 297.51 grams of heroin to support trafficking in heroin); *State v. McDonald*, 8th Dist. Cuyahoga No. 105276, 2018-Ohio-484, ¶ 14, 32 (relying on testimony from law enforcement officers regarding the process of cutting drugs in drug trafficking); *State v. Burton*, 8th Dist. Cuyahoga No. 107054, 2019-Ohio-2431, ¶ 48 (also considering evidence of "the presence of 'cut mixes[]'"). *Compare State v. Howard*, 8th Dist. Cuyahoga No. 105327, 2017-Ohio-8734, ¶ 6 (concluding that even when no heroin or cocaine is recovered, the presence of Mannitol is indicative of drug trafficking). *See also* R.C. 2925.14(A)(7) (drug paraphernalia includes mannite used for cutting a controlled substance). The evidence of a large quantity of

heroin and two bars of mannite found on Mr. Lopez-Olmedo permit a reasonable inference that he was preparing drugs for shipment or distribution.

{¶39} Viewing the evidence in a light most favorable to the prosecution, a rational trier of fact reasonably could have concluded that the State proved Mr. Lopez-Olmedo's conviction beyond a reasonable doubt. *See Jenks*, 61 Ohio St.3d at 273.

{¶40} Mr. Lopez-Olmedo's second assignment of error is overruled.

## ASSIGNMENT OF ERROR NO. 3

THE CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE 14TH AMENDMENT TO THE U.S. CONSTITUTION AND OF THE OHIO CONSTITUTION.

{¶41} In his third assignment of error, Mr. Lopez-Olmedo argues that his convictions[3] are against the manifest weight of the evidence because there was no evidence of the handling of the substance or the chain of custody and there were multiple and substantial breaks in the chain of custody which weighed on the credibility of the evidence. This Court disagrees.

{¶42} When considering whether a conviction is against the manifest weight of the evidence, this Court must:

> review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). A reversal on this basis is reserved for the exceptional case in which the evidence weighs heavily against the conviction. *Id.*, citing *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

---

[3] As we explained in footnote 2, Mr. Lopez-Olmedo was only convicted of trafficking in drugs in violation of R.C. 2925.03(A)(2). Again, we will limit our review accordingly.

{¶43} Evid.R. 901(A) provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Chain of custody is part of the authentication and identification requirement for the admission of evidence under Evid.R. 901(A) and the prosecution has the burden of proving the chain of custody of a specific piece of evidence. *State v. Ohara*, 9th Dist. Summit No. 27342, 2014-Ohio-5532, ¶ 8. However, the prosecution's burden of proving chain of custody is not absolute. *State v. Hickman*, 9th Dist. Summit No. 20883, 2002-Ohio-3406, ¶ 20. The prosecution is not required to disaffirm all possibilities of evidence tampering or substitution; rather, the prosecution is merely required to "'establish that it is reasonably certain that substitution, alteration, or tampering did not occur.'" *Ohara* at ¶ 8, quoting *Hickman* at ¶ 20. Nor is the State "'required to prove a perfect, unbroken chain of custody.'" *State v. Meyers*, 9th Dist. Summit Nos. 23864, 23903, 2008-Ohio-2528, ¶ 49, quoting *State v. Semedo*, 5th Dist. Stark No. 2006 CA 00108, 2007-Ohio-1805, ¶ 12. "Any breaks in the chain of custody go to the weight afforded to the evidence, not to its admissibility." *Hickman* at ¶ 20.

{¶44} On appeal, Mr. Lopez-Olmedo maintains that his conviction for trafficking in drugs was against the manifest weight of the evidence because there were breaks in the chain of custody for the items found in the attic and the bag of white substance found on him. To that end, Mr. Lopez-Olmedo asserts that there was "no evidence as to the handling of the substance or the chain of custody[]" and thus the State did not meet its burden of showing that no tampering, substitution, or alteration occurred.

{¶45} In this case, Forensic Drug Analyst Doyle testified on cross-examination that the Lorain Police Department gave her the white substance found on Mr. Lopez-Olmedo and the scale found in the attic for testing. State's Exhibit 3, a certified copy of the laboratory report prepared

by Forensic Drug Analyst Doyle, indicates that she received this evidence on November 16, 2018 at 10:07 a.m. and the officer and agency submitting the evidence was Officer Payne of the Lorain Police Department. Forensic Drug Analyst Doyle explained on direct examination that everything that comes into the laboratory is assigned and marked with an unique identifier as a laboratory number and how the laboratory numbers are generated. She then identified the laboratory numbers that were assigned to State's Exhibits 45, the digital scale, and 49, the white substance, and testified that both of those exhibits contained their assigned laboratory numbers. Additionally, the laboratory numbers and a description of the evidence were listed in the laboratory report.

{¶46} Forensic Drug Analyst Doyle indicated that after the evidence is marked with a laboratory number it is placed in the evidence locker until she is ready to test it. According to the laboratory report, Forensic Drug Analyst Doyle tested the evidence on November 16, 2018. She then explained how she tested the white substance and the digital scale and the results of the tests: the white substance was 188.16 grams of heroin and 6-Monoacetylmorphine and heroin and fentanyl was detected on the digital scale. These findings were also included in the laboratory report.

{¶47} Forensic Drug Analyst Doyle also testified regarding other markings made by her on the evidence bags in this case. She explained that when she opened the evidence bags to perform the tests, she wrote the word "'Open[,]'" the date and time, and her initials and when she was done testing, she sealed the evidence bag with red evidence tape, and wrote "'Sealed,'" the date and time, and her initials. Forensic Drug Analyst Doyle further testified that, based on the markings on the evidence bags and the lab results, State's Exhibits 45, the digital scale, and 49, the white substance, were the items that pertained to the laboratory report.

{¶48} Special Agent Meholif testified that when he searched Mr. Lopez-Olmedo he found a bag with a substance that he believed to be contraband rolled up in Mr. Lopez-Olmedo's waistband and that State's Exhibit 49 was the same substance he found in the search. Special Agent Meholif testified and State's Exhibit 2, the DVD with video footage of the search, shows that Special Agent Meholif set the bag with the substance on the bottom step coming from the house. Also in the video and according to Special Agent Meholif's testimony, he additionally found two bars of mannite on Mr. Lopez-Olmedo and placed those on the outside edge of the same step that he had placed the bag of substance. Additionally, Agent Meholif testified that there was loose money on the ground in that area that was believed to belong to Mr. Lopez-Olmedo. Detective Heathcoat testified that State's Exhibits 14 and 15, photographs taken by him, showed two bars of mannite and a baggie containing a white substance on the bottom step of the house and loose money on the ground below the step.

{¶49} The State also admitted as evidence the actual box of baggies, drug press, digital scale, and blender found in the attic. The State corroborated the identity of these items through photographs admitted into evidence and testimony from Detective Heathcoat and Detective Straub. Detective Heathcoat testified that he photographed each of these items in the attic and described the items in the pictures. Detective Straub testified that he searched the attic and that the actual box of baggies, digital scale, blender, and drug press that were admitted as exhibits at trial were the same items that he found when searching the attic and as depicted in the photographs taken by Detective Heathcoat.

{¶50} Mr. Lopez-Olmedo points out there was no testimony as to how the above evidence was handled after it was found, and thus the State has failed to establish that it was reasonably certain that no substitution, alteration, or tampering occurred. While there is a possible break in

the chain of custody in the testimony, the State carried its burden in this case. The State offered the actual items into evidence, along with photographs of the items, and Detective Straub's and Special Agent Meholif's testimony that those were the same items that they recovered during the execution of the search warrant. Additionally, there was evidence that Forensic Drug Analyst Doyle received the bag containing a white substance and the digital scale from Officer Payne of the Lorain Police Department, that she marked the evidence bags with unique laboratory numbers and as being opened and closed by her, and that State's Exhibits 45, the digital scale, and 49, the bag of white substance, contained all of those marking and were the items she received and tested.

{¶51} Based upon the foregoing, the State offered evidence showing the identity of the items found during the execution of the search warrant, tested in the laboratory, and produced at trial. Mr. Lopez-Olmedo, however, does not point to any evidence contradicting the State's evidence or suggesting that substitution, alteration, or tampering had occurred. *See generally State v. Wilson*, 8th Dist. Cuyahoga No. 102231, 2015-Ohio-4979, ¶ 46-50 (concluding that an appellant's drug trafficking and possession convictions were not against the manifest weight of the evidence due to alleged improper handling of evidence and evidence contamination where the State presented chain of custody evidence and appellant did not "point to any evidence suggesting that the evidence was improperly collected, transported, or analyzed[]"). Nor did he attempt to challenge the credibility of the State's evidence during the trial. *See generally State v. Jenkins*, 4th Dist. Highland No. 12CA10, 2013-Ohio-595, ¶ 11 (noting that defense counsel could have presented the chain of custody issue to the jury during cross-examination of the State's witness, in the defense's case-in-chief, or in closing argument and thereby challenged the credibility of the state's chain of custody evidence). Accordingly, we conclude that the State's evidence

"'establish[ed] that it is reasonably certain that substitution, alteration, or tampering did not occur.'" *See Ohara*, 2014-Ohio-5532, at ¶ 8, quoting *Hickman*, 2002-Ohio-3406, at ¶ 20.

{¶52} Having reviewed the record, this Court cannot conclude that the jury clearly lost its way and created a manifest miscarriage of justice when it found Mr. Lopez-Olmedo guilty of trafficking in drugs. *See Otten*, 33 Ohio App.3d at 340. Given the positive identification of the evidence from various witness, and the jury's ability to compare and scrutinize the actual baggie of white substance, the box of baggies, the digital scale, the drug press, and the blender to the photographs of each of those items, the jury could have reasonably believed that each of those items presented at trial, and the items submitted for testing, were the same items collected during the execution of the search warrant. Mr. Lopez-Olmedo has not shown that this is the exceptional case where the evidence weighs heavily against his conviction. *See id.* at 340, citing *Martin*, 20 Ohio App.3d at 175.

{¶53} Mr. Lopez-Olmedo's third assignment of error is overruled.

### III.

{¶54} Each of Mr. Lopez-Olmedo's assignments of error are overruled. The judgment of the Lorain County Court of Common Pleas is affirmed.

Judgment affirmed.

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

LYNNE S. CALLAHAN
FOR THE COURT

TEODOSIO, P. J.
CONCURS.

HENSAL, J.
DISSENTING.

{¶55} Criminal Rule 52(B) provides that a plain error or defect affecting a substantial right may be noticed although it was "not brought to the attention of the court." The majority acknowledges that Mr. Lopez-Olmedo made the trial court aware of a problem with him hearing the Spanish interpreters. It also acknowledges that the court did not do anything to correct the

issue and concludes that it was an abuse of discretion for the court to continue the trial without attempting to resolve the problem. Nevertheless, it reasons that Mr. Lopez-Olmedo had to object again after the court decided to proceed with the trial. I do not agree that a party must, under these circumstances, raise a second objection to preserve an issue after the trial court is made aware of it and does nothing about it. "The purpose of objections is to put the court on notice of a party's particular complaint, at a time when errors can be corrected." *Messer v. Messer*, 2d Dist. Darke No. 1570, 2002-Ohio-4196, ¶ 21. There is no requirement in Rule 52(B) that a party must object a second time if it does not like how the trial court addressed (or did not address) the issue it raised.

**{¶56}** Even if Mr. Lopez-Olmedo were required to establish plain error, I do not agree with the majority's attempt to address the merits of the issue. Mr. Lopez-Olmedo has not argued plain error in his appellate brief, and this Court has been clear that it "will not construct a plain error argument on behalf of an appellant who has failed to argue plain error on appeal." *State v. Irvine*, 9th Dist. Summit No. 28998, 2019-Ohio-959, ¶ 42. Developing a plain-error argument for Mr. Lopez-Olmedo as the majority has done could jeopardize Mr. Lopez-Olmedo's ability to argue that his appellate counsel was ineffective for not making a plain-error argument in an application for reopening under Appellate Rule 26(B). I, therefore, respectfully dissent.

APPEARANCES:

GIOVANNA V. BREMKE, Attorney at Law, for Appellant.

J.D. TOMLINSON, Prosecuting Attorney, and LINDSEY POPROCKI, Assistant Prosecuting Attorney, for Appellee.